**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| Hon. JASON NEMES, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | **CASE NO. 3:20-CV-407-CRS** |
| | ) | |
| v. | ) | |
| | ) | **INTERVENOR'S** |
| CARL BENSINGER, *et al.* | ) | **COMPLAINT FOR INJUNCTIVE** |
| | ) | **AND DECLARATORY RELIEF** |
| Defendants. | ) | |
| | ) | |

Intervening Plaintiff, Amy McGrath for Senate, Inc. (hereinafter, the "McGrath Campaign"), files this intervening complaint against the Defendants in this matter, their respective agents, officers, employees, and successors, and further alleges as follows:

**<u>INTRODUCTION</u>**

1.       The most sacred right in our democratic system of government is the right to vote. Amy McGrath is running for the United States Senate seat which has been held by Mitch McConnell for the last 35 years.  Her campaign, Amy McGrath for Senate, Inc., has a significant and legally cognizable interest in ensuring that the Campaign's supporters and all voters in the Commonwealth are provided with access to the polls on Election Day and the ability to safely exercise their democratic right to participate in free and fair elections.

2.        As articulated in the Underlying Complaint[1] filed in this matter by the Hon. Jason Nemes, James "Rich" Howland, Ken Kearns, Aaron Gillum, Theodore Roberts, Tyson Hermes, and Erik Hermes (hereinafter, "Original Plaintiffs"), the COVID-19 outbreak has caused significant challenges to Kentuckians ability to safely participate in elective politics.

3.      In addition to those particularized concerns laid out in the Underlying Complaint regarding disenfranchised voters, all Kentuckians are facing unique and distinct challenges in accessing the ballot box in light of the pandemic and the Emergency Regulations being carried out by the Defendants.

4.      The McGrath Campaign has invested both substantial time and resources in its efforts to ensure that voters are fully informed of their choices during this election season, and are able to exercise their right to vote as they see fit.  More specifically, the McGrath Campaign has invested hundreds of thousands of its campaign dollars in text-messaging services, mailers, television, radio, internet advertising, newspapers, setting up websites, hotlines, recruiting poll workers, training challengers and observers to take part during the ballot counting process and on election day, voter registration efforts, and professional staff whose sole focus is voter protection and education.

5.      The restrictions on the number of polling places outlined in the Underlying Complaint, in addition to the restrictions placed on accessing and submitting absentee ballots threaten to disenfranchise hundreds of thousands of Kentuckians, many of whom are elderly, lack internet access and are therefore presented with unique difficulties in obtaining absentee ballots, are minorities, and are supporters of the McGrath Campaign who hope to cast a ballot for Amy McGrath on June 23.

6.      The need for injunctive and declaratory relief is pressing because Kentucky's primary election is scheduled to take place in only 11 days.

---

[1] R. 1 (referred to hereinafter as the "Underlying Complaint.")

## JURISDICTION AND VENUE

7.     The McGrath Campaign brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the First and Fourteenth Amendments to the U.S. Constitution, in addition to the Voting Rights Act ("VRA").

8.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States. The McGrath Campaign brings this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the U.S. Constitution and federal law.

9.     This Court has personal jurisdiction over Defendants, who are sued only in their official capacities as officers and officials of the Commonwealth of Kentucky.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b).  Several of the Original Plaintiffs are located in Louisville, several Defendants are located in Louisville, and a substantial part of the events that gave rise to both the Underlying Complaint and the claims in this Complaint occurred in this judicial district.

11.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

### I.     INTERVENING PLAINTIFF

12.     The Intervening Plaintiff, McGrath for Senate, Inc., is the primary political committee for Amy McGrath's campaign for the United States Senate.  It is duly organized

pursuant to Section 527 of the U.S. Internal Revenue Code (26 U.S.C. § 527) as a non-profit corporation, and organized under the laws of the Commonwealth of Kentucky.

13.     As part of its mission, the McGrath Campaign works to ensure that its supporters are able to effectively exercise their right to vote.  The McGrath Campaign is directly harmed by the restrictions placed on the number of polling sites and on accessing and submitting absentee ballots, both of which make it more difficult for the McGrath Campaign's supporters to vote.

14.     "An organization may establish an injury to itself sufficient to support standing to challenge a statute or policy by showing that the statute or policy frustrates the organization's goals and necessitates the expenditure of resources in ways that would not otherwise be required."  *One Wisconsin Institute, Inc. v. Nichol*, 186 F.Supp.3d 958, 966 (W.D. Wis. 2016) citing MOORE'S FEDERAL PRACTICE ¶ 101.60(1)(f) (3d ed. 2015) (citing *Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 (1982)).  Redirecting resources to educate voters about complying with new registration laws is an injury sufficient to meet organizational standing.  *Nichol*, 86 F. Supp. 3d at 967.  In a case challenging an Indiana law that required photo identification to vote, the Seventh Circuit found that the new law injured the Democratic Party by compelling them to devote resources to getting its supporters to the polls who would otherwise be discouraged to vote by the new law.  *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) aff'd, 553 U.S. 181, 128 (2008).  "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."  *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180-84 (2000)).

15.     Here, the McGrath Campaign clearly has standing to challenge these laws because the Defendants' decisions to limit access to absentee ballots and limit the number of polling

places in Jefferson, Fayette, Kenton, Boone, and Campbell Counties have forced the campaign to redirect their attention and resources toward turning out voters who would otherwise vote at the polls. More specifically, the McGrath Campaign has diverted resources toward educating voters about absentee voting and early voting, and has had to redirect the way its resources are being utilized to get people to the polls on Election Day despite voter fears of long lines and voting problems exacerbated by the Emergency Regulation at issue here.

16.     Additionally, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004). "The individual participation of an organization's members is not normally necessary when the association seeks prospective or injunctive relief for its members." *Id*. at 574. For instance, the Sixth Circuit has held that a political party and labor organizations suffered an imminent and real injury and had standing to challenge a law that required confirmation of voters' residences before the ballot could be counted because the polling workers would inevitably make mistakes. *Id*.

17.     The McGrath Campaign additionally asserts sufficient associational standing on behalf of those who support it. Supporters of the campaign have standing to sue in their own right because many supporters have not obtained the ability to vote early or with an absentee ballot, despite their best efforts. As a result, voters with health concerns, transportation complications, difficulties accessing the interest, or those unable to contact the County Clerk by phone will not have an opportunity to vote in-person or otherwise. The McGrath Campaign represents all of its supporters that are faced with the Hobson's choice of risking their health to

vote in-person at a single polling location, or not vote. Ultimately, many voters will not have the ability to express support for their chosen candidate as a result of there being only one polling station in these Counties, and because of the restrictions placed on absentee ballots.

## II.    ORIGINAL PLAINTIFFS

18.    Plaintiff Jason Nemes is the elected State Representative for Kentucky's 33rd State House District. Mr. Nemes' district covers northeast Louisville, and parts of Oldham County.  Upon information and belief, Mr. Nemes is a U.S. citizen, a registered voter in the Commonwealth of Kentucky, a registered Republican, and a voter within Jefferson County, Kentucky.  Mr. Nemes brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

19.    Upon information and belief, Plaintiff James "Rich" Howland is a U.S. citizen a registered voter in the Commonwealth of Kentucky, a registered Republican, and voter within Jefferson County, Kentucky.  Mr. Howland brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

20.    Upon information and belief, Plaintiff Ken Kearns is a U.S. citizen, a registered voter in the Commonwealth of Kentucky, a registered Republican, and voter within Fayette County, Kentucky.  Mr. Kearns brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

21.    Upon information and belief, Plaintiff Aaron Gillum is a U.S. citizen, a registered voter in the Commonwealth of Kentucky, a registered Republican, and a voter within Boone County, Kentucky.  Mr. Gillum brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

22.     Upon information and belief, Plaintiff Theodore J. Roberts is a U.S. citizen, a registered voter in the Commonwealth of Kentucky, a registered Republican, and voter within Boone County, Kentucky.  Mr. Roberts brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

23.     Upon information and belief, Plaintiff Tyson Hermes is a U.S. citizen, a registered voter in the Commonwealth of Kentucky, a registered Republican, and voter within Kenton County, Kentucky.  Mr. Hermes brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

24.     Upon information and belief, Plaintiff Erik Hermes is a U.S. citizen, a registered voter in the Commonwealth of Kentucky, a registered Republican, and a voter within Campbell County, Kentucky.  Mr. Hermes brings the underlying suit because of his concern about access to the polls for many Kentuckians as a result of the challenged practices.

## III.    DEFENDANTS

25.     Defendants Carl Bensinger, John Aubrey, Linda Huber, and Bobbie Holsclaw are members of the Jefferson County Board of Elections; Defendant Holsclaw is the Jefferson County Clerk; collectively, they enforce and administer the Commonwealth's voting laws within Jefferson County, Kentucky.

26.     Defendants Don Blevins, Kathy Witt, Marilyn Dishman, and Daniel Miller are members of the Fayette County Board of Elections; Defendant Blevins is the Fayette County Clerk; collectively, they enforce and administer the Commonwealth's voting laws within Fayette County, Kentucky.

27.     Defendants Gabrielle Summe, Chuck Korzenborn, Richard Scott Kimmich, and Sarah Rogers are members of the Kenton County Board of Elections; Defendant Summe is the

Kenton County Clerk; collectively, they enforce and administer the Commonwealth's voting laws, including within Kenton County, Kentucky

28.     Defendants Justin Crigler, Michael Helmig, Emily Shelton, and Michael Howard are members of the Boone County Board of Elections; Defendant Crigler is the Boone County Clerk; collectively, they enforce and administer the Commonwealth's voting laws within Boone County, Kentucky.

29.     Defendants Jim Leursen, Mike Jansen, James Shroer, and Jack Snodgrass are members of the Campbell County Board of Elections; Defendant Leursen is the Campbell County Clerk; collectively, they enforce and administer the Commonwealth's voting laws within Campbell County, Kentucky.

30.     Defendant Albert Benjamin Chandler, III is the current Chairman of the Kentucky Board of Elections, and Defendants Sherry Whitehouse, George Russell, Katrina Fitzgerald, Deanna Brangers, Cory Skolnick, Dwight Sears, and James Lewis are members of the Kentucky Board of Elections.  Pursuant to law, the Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state." Ky. Rev. Stat. § 117.015.

31.     Defendant Michael Adams is the Republican Secretary of State of Kentucky, therefore serving as the Commonwealth's Chief Election Official, and as an ex officio, non-voting member of the Kentucky Board of Elections.

32.     Defendant Andrew Beshear is a Democrat, and Governor of the Commonwealth of Kentucky.

33.     All Defendants are sued solely in their official capacities.

## FACTS

### The COVID-19 Crisis within the Commonwealth

34.    In early 2020, the Commonwealth of Kentucky was hit very hard by the COVID-19 pandemic.  To date, almost 12,000 Kentuckians have been infected with COVID-19, and nearly 500 have died from it.

35.    In an effort to protect the citizens of Kentucky, and to slow the spread of this terrible disease, Kentucky's elected officials have taken extraordinary steps to limit personal contact between the Commonwealth's citizens.

36.    In light of the pandemic's threat, Secretary of State Adams recommended to Governor Beshear on March 16, that the primary election scheduled for May be postponed.[2]

37.    Beshear accepted the recommendation and, in conjunction with the State Board of Elections, postponed the primary election to June 23, 2020.[3]

38.    A few days later, on March 22, Governor Beshear issued a state-wide "healthy-at-home" order wherein he urged residents to practice "social distancing" to prevent the virus's spread.[4]  As part of this effort, Governor Beshear further ordered that all non-life-sustaining businesses cease in-person services, advised that Kentucky's schools should remain closed for the rest of the school year, and deployed both the National Guard and additional law enforcement to assist at hospitals and medical facilities.[5]

---

[2] https://www.fox19.com/2020/03/16/ky-secretary-state-recommends-governor-delay-primary-until-june/
[3] Ky. Office of the Governor, State of Emergency, Exec. Order No. 2020-296 (Apr. 24, 2020), https://governor.ky.gov/attachments/20200424_Executive-Order_2020-296_SOE-Relating-to-Elections.pdf
[4] Ky. Office of the Governor, State of Emergency, Exec. Order No. 2020-257 (Mar. 25, 2020), https://governor.ky.gov/attachments/20200325 Executive-Order 2020- 257 Healthy-at-Home.pdf
[5] Ky. Office of the Governor, Kentucky's Response to COVID-19 (May 17, 2020), https://governor.ky.gov/covidl9; Commonwealth of Kentucky, Gov. Beshear Advises Schools to

39.     In light of the threat, Kentucky's General Assembly passed emergency legislation granting new powers to the Governor, the Secretary of State, and the Board of Elections to modify Kentucky's existing voting procedures during a state of emergency.  *See* H.B. 351 § 74(1)(1).  The Governor vetoed select portions of the legislation, but the General Assembly overrode the veto.

40.     Pursuant to H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.  Before the Board of Elections proposed procedures may be put into practice, both the Secretary of State and the Governor must approve them.

41.     On April 4, both Governor Beshear and the Kentucky Department of Public Health advised that Kentuckians should wear masks and practice social distancing to slow the virus' spread.

42.     On April 8, Governor Beshear issued an executive order limiting the number of people permitted inside essential businesses by restricting shopping trips to one adult per household at a time, and further announced the closure of some state parks.

43.     On April 21, Governor Beshear announced the "Healthy at Work" initiative to provide guidance to Kentucky businesses on when and how they could expect to safely reopen. Under the plan, businesses could only begin to reopen after the Governor determined that Kentucky met delineated benchmarks related to the prevalence and spread of the disease, and the protections those businesses had in place.

---

Remain Closed to In-Person Instruction (Apr. 20, 2020), https://kentucky.gov/Pages/Activitystream. aspx?n=GovernorBeshear&prId=135.

44.      On April 23, Secretary of State Adams issued recommendations for how June elections were to be conducted.  The recommendations included a provision that did "empower all county clerks to reduce the number of sites for in-person voting..."[6]

45.      On April 24, Governor Beshear issued an Executive Order directing the Board of Elections to promulgate regulations addressing the June elections with the aim of minimizing the spread of COVID-19.[7]

46.      In response to this Order, the Board of Elections promulgated an Emergency Regulation, 31 KAR 4:190E (hereinafter, "Emergency Regulations), to govern the June 23, 2020 election.  Relevant here, the Regulations provided:

    a.  The Emergency Regulations apply only to the Commonwealth's June 23, 2020 election.  (31 KAR 4:190E, Section 1).

    b.  The County Clerks shall transmit absentee ballots to voters who request an absentee ballot within seven (7) days of the request, but no later than June 16, 2020. (31 KAR 4:190E, Section 5)

    c.  All voters who wish to request a mailed absentee ballot must do so by 11:59 p.m. EST on June 15, 2020 (31 KAR 4:190E, Section 6)

    d.  Absentee ballots must be received by the County Clerk of the voter's county of registration no later than 6:00 p.m., local time, on June 23, 2020, in order to be counted, except that, absentee ballots delivered by the United States Postal Service and bearing a postmark of June 23, 2020 or an earlier date, shall be counted if received by 6:00 p.m., June 27, 2020. (31 KAR 4:190E, Section 6)

    e.  To assist County Clerks in managing the flow of receipt of voter-delivered absentee ballots, the State Board of Elections may purchase secure drop-boxes and provide them to County Clerks based on request and availability.  (31 KAR 4:190E, Section 7)

_____

[6] Letter from Sec of State Adams to Governor Beshear (Apr. 23, 2020), https://governor.ky.goviattachments/20200423_Ltr-from-Sec-of-State-Adams.pdf.
[7] Ky. Office of the Governor, State of Emergency Relating to Kentucky Elections, Exec. Order 2020-296 (Apr. 24, 2020), https://elect.ky.gov/SiteAssets/Pages/default/EO%202020-296.pdf

     f.   "County Clerks are directed to reduce the number of sites for in-person voting on June 23, 2020, with such reduction and such sites to be pre-approved by the State Board of Elections." (31 KAR 4:190E, Section 11)

     g.   All vote totals must be transmitted via "Certification, Official Count, Record of Election Totals" SBE 49, 11/03 to the Secretary of State's Office no later than 6:00 p.m., local time, June 30, 2020. (Section 16)[8]

47.     In violation of the law, the above referenced Emergency Regulations were noticed for a public hearing on July 31, 2020 at 10:00 AM with written comments due on the same date, notwithstanding the fact that the Emergency Regulations only applies to the conduct of the June 23 Primary Election.[9]  This has led to a situation where interested parties have no means of seeking relief from these Emergency Regulations outside the Courthouse doors.

48.     As the spread of the virus plateaued, Governor Beshear began to reopen Kentucky's businesses.  On April 27, health care services and facilities were permitted to reopen on a limited basis on the condition that the entities did comply with strict COVID-19 guidance.

49.     On May 4,  Governor Beshear announced that some other businesses could reopen on May 11, provided again that those businesses complied with strict safety protocols to protect individuals from the spread of COVID-19.

50.     On May 7, Governor Beshear announced a tentative schedule for reopening more of Kentucky businesses.   Again, these re-openings were contingent on those businesses complying with strict safety protocols to protect individuals from the spread of COVID-19.

51.     On May 15, the Governor announced that state parks would reopen on June 1.

52.     Although the Governor provided guidance permitting Kentucky government offices to begin reopening on May 18, several declined to reopen out of concerns over the pandemic.  To this point, Fayette County Clerk Don Blevins, Jr. explained, that "[m]ost County

---

[8] Ky. Bd. of Elections, Procedures for June 23, 2020 Election, 31 Ky. Admin. Regs. 4:190E (2020) (available at https://www.sos.ky.gov/elections/Pages/2020-Primary-Updates.aspx)

Clerk offices will need to remain closed to the public until after the primary election in late June," because they "simply cannot risk a member of staff contracting the virus and forcing a quarantine of all or part of an office," which would "jeopardize [their] ability to support and conduct the election."[10]

<u>Holding Elections Amidst the Pandemic</u>

53.    As has been demonstrated above, the COVID-19 pandemic has threatened the safety of our citizens and dramatically altered the way Kentuckians have lived their lives for months.  Without more effective procedures in place to get absentee ballots into the hands of voters, and to also expand in-person voting, the pandemic also threatens the health of our democracy.

54.    To this end, in light of the ongoing pandemic, states all around the country are struggling to provide access to the polls, while also maintaining the safety of voters.  The Center for Disease Control ("CDC") even issued guidelines for voting during the pandemic, recommending that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd sizes at polling stations."[11]

55.    While Kentucky's elected and appointed officials have implemented many of these measures, the decision to only provide voters with a single polling location in many of the Commonwealth's most populous counties will make it difficult, likely impossible, to comply with this guidance.

---

[9] *Id.* at p, 11 ("Public Hearing and Comment Period")

[10] Steve Rogers, *Fayette Circuit Clerk, Others to Remain Closed*, WTVQ (May 18, 2020), https://www.wtvq.com/2020/05/18/fayette-circuit-clerk-others-remain-closed/ (last visited June 11, 2020)

[11] CDC, Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019 ncov/community/electionpolling-locations.html

56.    Notwithstanding significant efforts in other states to encourage absentee voting, substantial numbers of voters have nevertheless turned out to vote in-person on Election Day.

57.    In Georgia, which just held its election on June 9, after the Underlying Complaint was filed in this matter, the election has been dubbed a "catastrophe."  According to reports, "[h]ours-long waits, problems with new voting machines and a lack of available ballots plagued primary voters in majority-minority counties in Georgia … conditions the secretary of state called 'unacceptable' and vowed to investigate."[12]

58.    According to reports, "[i]n parts of Atlanta, lines snaked around the block and some people reported waiting over four hours to vote."[13] One news source shared that "Jason Esteves, the chairman of the Atlanta Public Schools Board of Education, waited in line for nearly three hours to vote Tuesday morning in Northwest Atlanta. Though he and his wife had both requested absentee ballots, only hers showed up before the primary."[14]  There are numerous similar accounts throughout the state of Georgia.

59.    Reports also claim "[t]he troubles in Georgia were most harshly felt in heavily African American counties in and around Atlanta, where some defective machines set off scrambles for provisional ballots, which were in short supply."[15]

60.    As noted in the Underlying Complaint, the recent primary election in Wisconsin was plagued by many of the same issues.  In the days leading up to the election, Wisconsin election officials faced a huge backlog of requests for absentee ballots and questions about

---

[12] Petra Cahill, Georgia's primary election 'catastrophe,' a surge in COVID-19 cases and George Floyd's legacy,  https://www.nbcnews.com/news/morning-briefing/georgia-s-primary-election-catastrophe-surge-covid-19-cases-george-n1229076#anchor-Georgiaelectioncatastropheinlargelyminorityareassparksinvestigation (last visited June 12, 2020).
[13] *Id.*
[14] Fredreka Scouten and Geogory King, *'Always some sneak trick': Black voters in Georgia say the state's primary meltdown was no accident*, https://www.cnn.com/2020/06/10/politics/georgia-voting-issues-black-voters/index.html (lasted visited June 12, 2020).

voting absentee, including how to satisfy the state's registration requirements, how to properly request an absentee ballot, and how to return it in time to be considered.[16]

61.    As a likely consequence of these deficiencies, there was "a dramatic shortfall in the number of voters on election day as compared to recent primaries" and "a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State."[17]    As explained in the New York Times, Wisconsin's decision to hold its election without sufficiently addressing these issues led to widespread disenfranchisement and electoral chaos.[18]

62.    Again, as noted in the Underlying Complaint, the Wisconsin Department of Health found that 52 people who voted under these conditions in Wisconsin later tested positive for COVID-19.  Furthermore, economists found a "statistically and epidemiologically significant association between in-person voting and the spread of COVID-19 two to three weeks after the election."[19]

63.    As laid out in extensive detail in the Underlying Complaint, the health risks of in-person voting this election season are especially severe for voters with underlying medical conditions, Black voters, older voters, and voters with disabilities.[20]

---

[15] *Id.*

[16] *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020)

[17] *Id.*

[18] Astead W. Herndon and Jim Rutenberg, Wisconsin Election Fight Heralds a National Battle Over Virus-Era Voting, N.Y. Times (Apr. 6, 2020), https://www.nytimes.com/2020/04/06/us/politics/wisconsin-primary-voting- coronavirus.html

[19] Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary* at 1-2, National Bureau of Econ. Research (May 2020), https://www.nber.org/papers/w27187.pdf.

[20] *See* Underlying Complaint, R. 1 at ¶¶ 55-72.

64.     In sum, the inevitable result of limiting the number of voting locations in such populous areas led to a much greater chance of COVID-19 exposure for voters, particularly those that have underlying medical conditions, Black voters, older voters, and voters with disabilities.[21]

65.     Additionally, election officials ran out of supplies, and many voters simply could not wait in the multiple-hour lines to cast their ballot, leading to significant disenfranchisement.

66.     The Sixth Circuit has recognized that such significant waits and long lines place a consequential burden on voters, and may deter citizens from voting.[22]

67.     As has been seen in the other states that have restricted the number of polling sites, it is expected that lines in the populous Kentucky counties that are only providing a single voting location will be excessively long, leading many who intended to vote in-person to abstain from voting at all.

68.     Collectively, and particularly in light of COVID-19, the single polling location in Jefferson, Fayette, Kenton, Boone, Campbell, and other counties burdens Kentucky citizens' fundamental right to vote.

69.     On June 3, 2020, the Kentucky Board of Elections conducted a meeting to consider the plans for the 2020 elections.  At that meeting it became clear that, notwithstanding the clear and unavoidable threat that limited polling locations pose, the Defendants have decided to limit voting locations inside their respective counties for the upcoming election.

70.     Defendant Clerk Blevins, of Fayette County, indicated that he did not wish to open more polling locations because if he did "people would use them," conceding that expanded in-person voting would increase turnout.   Mr. Blevins further suggested that his office

---

[21] *Id.*
[22] *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656 (6th Cir. 2016) (Gilman, R., concurring) ("[A]s supported by the current record, longer line will deter citizens from voting.")

anticipated the participation of 100,000 to 120,000 voters this election cycle, but had only received 46,000 requests for absentee ballots as of that date.[23]

71.     Defendant Clerk Holsclaw, of Jefferson County, explained that she did not wish to open more polling locations, notwithstanding the fact that she anticipated more than 130,000 voters, but had only received 47,000 requests for absentee ballots as of that date.   She acknowledged there would be long lines.[24]

72.     Defendant Clerk Summe, of Kenton County, likewise stated that she did not wish to open more polling locations, notwithstanding the fact that she anticipated more than 60,000 voters, but had only received 10,000 requests for absentee ballots as of that date.[25]

73.     The County Board of Elections Defendants repeatedly suggested that their decision to limit polling locations was due, in part, to poll worker shortages, but this is simply not true.

74.     Upon information and belief, many Kentuckians in these counties have volunteered to serve as poll workers, but have been turned down.

75.     Similar to representations made on this point in the Underlying Complaint, the McGrath Campaign is also aware of many individuals who volunteered to serve as poll workers in populous counties only offering one polling location, but were advised they were not needed.

76.     In the end, the Kentucky Board of Elections approved the use of a single precinct in these counties.

77.     In addition to these problems, the McGrath Campaign has learned that many voters have been unable to obtain absentee ballots.

---

[23] https://www.youtube.com/watch?v=mwE74EqN9_w (last visited June 12, 2020).
[24] *Id.*
[25] *Id.*

78.    Upon information and belief, County Clerks have simply been unable to process requests for absentee ballots in a timely fashion.  These delays disenfranchise voters, and necessarily exacerbate the problems which populous counties with a small number of voting sites will experience on Election Day.

79.    While these problems are serious, it is not too late for Kentucky to avoid the debacle that other states have experienced on Election Day.

80.    It is not hyperbole to say that the credibility of the June 23 primary depends on providing all Kentuckians access to the polls, something that can only be achieved by means of the relief sought in this Complaint, expanding access to in-person voting, the availability of absentee voting, and providing the Defendants with the staff and supplies they need to carry out this election.  Kentuckian's confidence and trust in this election depends on it.

## COUNT 1 - UNDUE BURDEN ON THE RIGHT TO VOTE

U.S. CONST. AMEND. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202

81.    The McGrath Campaign reincorporates each and every factual allegation as if set forth fully herein.

82.    A court considering a challenge to a state election law must balance the injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

83.     Unless the McGrath Campaign is granted the relief requested herein, thousands of Kentuckians' right to vote, including supporters of the McGrath Campaign, will be severely burdened in the upcoming June 23, 2020 election.

84.     In light of the Emergency Regulations and the unprecedented social distancing measures that Kentucky citizens have to take to slow the spread of COVID-19, many Kentucky voters who would have voted on Election Day will not be able to do so.  Furthermore, because of the Emergency Regulations, significant backlog of requests for absentee ballots, and delays in getting those absentee ballots to voters, Kentucky voters are at a high risk of not being able to register in time for absentee voting by the June 15 deadline, or will otherwise be unable to receive their ballots with sufficient time to return said ballot to the Defendant Clerks prior to the June 27 deadline.  This too will lead to disenfranchisement.

85.     The Defendants cannot provide any colorable justification as to why the June 15, 2020 deadline for requesting an absentee ballot requests should not be extended.

86.     In short, the challenged laws are not supported by a state interest that is sufficient to justify the resulting burdens on the right to vote, and thus, these laws violate the First and Fourteenth Amendments.

## COUNT 2 - DENIAL OF PROCEDURAL DUE PROCESS

### U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

87.     The McGrath Campaign reincorporates each and every factual allegation as if set forth fully herein.

88.     The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of … liberty … without due process of law." U.S. CONST. amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance

of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015). Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F. 3d at 1192–93. Second, "courts must consider the 'fairness and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id.* at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures. *Id.* (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, (quotation and citation omitted).

89.    The Emergency Regulations for absentee voting must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

90.    "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)).

91.    There is little question that Kentucky's election process is fundamentally unfair.

92.     While the Emergency Regulations only apply, by their terms, to the June 23 election, the Regulations establish that a public hearing on those regulations shall be held on July 31, 2020—over a month after the very Regulations being commented on will become moot.

93.     The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most sacred of rights in a democratic society and represents a significant liberty interest.

94.     The Emergency Regulations being challenged threaten to deprive Kentucky voters of this right in the upcoming election.  Given the unprecedented situation at hand, Kentucky must establish adequate procedures to ensure that voters have a reliable, fair, effective and safe method to cast their ballots in the June 23, 2020 election. Because the challenged laws are inadequate in all respects, and substitute procedures are readily available to protect voters' rights with minimal burden to the State, the challenged laws violate Kentucky voters' procedural due process rights.

## COUNT III  - EQUAL PROTECTION

U.S. Const. Amend. XIV, 42 U.S.C. § 1983

95.     The McGrath Campaign reincorporates each and every factual allegation as if set forth fully herein.

96.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from "denying to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision requires that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

97.      The Equal Protection Clause applies to voting. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

98.      In light of the different approaches taken by Kentucky Counties in response to the COVID-19 pandemic, in-person voting will be available to some Kentucky citizens but not to others, depending solely on the County in which that voter resides.  Similarly, some Defendants are permitting voters to apply for absentee voting over the phone, while other Defendants will not permit such, opting instead to send a paper application for an absentee ballot to the voter's home, which would than have to be returned prior to the June 15 deadline.

99.      The inconsistencies discussed above and the diverging standards across Counties and Defendants' Clerks' Offices are denying many voters and McGrath Campaign supporters of equal protection under the law.

## COUNT IV - VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT

52 U.S.C. § 10301

100.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [52 USCS § 10303(f)(2)], as provided in subsection (b).

101.    Black citizens of Kentucky have historically voted in-person.

102.    Disenfranchisement caused by long wait times will disproportionately impact the Black communities in Louisville and Lexington.

103.    The single polling location in Fayette and Jefferson counties will result in the denial or abridgement of the right to vote of many Black supporters of the McGrath Campaign and others on account of their race or color in violation of Section 2 of the Voting Rights Act of 1965 (52 U.S.C. § 10301).

## PRAYER FOR RELIEF

WHEREFORE, the McGrath Campaign demands judgment against Defendants as prayed for, including:

A.  That this Court issue a declaration that the current system of absentee voting is unconstitutional, in contravention of the First and Fourteenth Amendments of the United States Constitution.

B.  That this Court issue a declaration that the single polling locations in Jefferson, Fayette, Kenton, Boone, and Campbell Counties (in addition to other large Kentucky counties) are unconstitutional, in contravention of the First and Fourteenth Amendments of the United States, and the VRA.

C.  That this Court enter permanent and preliminary injunctive relief requiring that Defendants be required to place additional staff in the County Clerks' offices to provide ballots to voters by providing curbside or drive through service for voters to request ballots until June 22, 2020, in addition to fielding phone requests for ballots and filling those requests for ballots over the phone, by completing the online portal application for the voter requesting the ballot, and mailing the voter a ballot directly to the voter's house, and in so doing, extend the deadline to request a ballot to June 19, 2020, at 11:59 a.m. EDT, and require that all ballots be mailed by the Defendants to voters by June 20, 2020.

    i.  Alternatively, that the Court enter permanent and preliminary injunctive relief requiring that Defendants permit campaigns, volunteers, or other civic organizations to complete ballot requests for voters over the phone, just as Clerks are permitted to do, and extend the deadline for requesting a ballot to June 19, 2020, at 11:59 a.m. EDT, and require that all ballots be mailed by the Defendants to voters by June 20, 2020.

D.  That the Court enter permanent and preliminary injunctive relief requiring that the Defendants secure drop boxes as referenced in 31 KAR

23

4:190(E)(7), that are accessible twenty-four hours a day, seven days a week for voters to return their completed absentee ballot.

E.  That the Court enter permanent and preliminary injunctive relief prohibiting the Defendants from providing only a single polling location in Jefferson, Fayette, Kenton, Boone and Campbell Counties (in addition to other large Kentucky Counties) in the 2020 Primary Election.

F.  That the Court enter permanent and preliminary injunctive relief requiring the Defendants extend the hours that polling places will remain open on Election Day from 6:00 a.m. until 9:00 p.m. local time.

G.  That the Court enter permanent and preliminary injunctive relief requiring that Defendants extend the hours that polling places are open for in-person absentee early voting Monday through Friday through the date of the election.

H.  That the Court enter permanent and preliminary injunctive relief requiring that Defendants provide personal protective equipment (PPE) for all poll workers.

I.  That the Court enter permanent and preliminary injunctive relief requiring that Defendants have a plan in place for disabled and elderly voters who may be required to wait in long lines in the heat for extended periods of times on Election Day or are required to walk long distances to the voting location.

J.  That the Court enter permanent and preliminary injunctive relief requiring that Defendants have a secure and efficient process in place for voters who do not receive a requested absentee ballot prior to Election Day, and therefore wish to vote in-person on Election Day.

K.  That Plaintiffs be awarded their costs in this action, including reasonable attorney fees under 42 U.S.C. § 1988; and

L.  Any such other relief as this Court shall deem just and proper.

Respectfully submitted,

*/s/ William H. Brammell, Jr.*
William H. Brammell, Jr.
Kayla M. Campbell
DRESSMAN BENZINGER LAVELLE PSC
2100 Waterfront Plaza
321 West Main Street

Louisville, KY  40202
(502) 572-2500

*Counsel for Intervening Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing by electronic service on all parties through the Court's electronic filing system on this 12th day of June, 2020.

/s/ *William H. Brammell, Jr.*
William H. Brammell, Jr.

889724.2