**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| Hon. JASON NEMES, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | **CASE NO. 3:20-CV-407-CRS** |
| | ) | |
| v. | ) | |
| | ) | |
| CARL BENSINGER, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**THE McGRATH CAMPAIGN'S MEMORANDUM IN SUPPORT**
**OF PROPOSED MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

---

Amy McGrath for Senate, Inc. (hereinafter, the "McGrath Campaign"), files this Motion for a Temporary Restraining Order and/or Preliminary Injunctive to request relief prior to the fast-approaching June 23, 2020 primary election.

Statement of Facts[1]

It goes without saying that we are all living in a truly unprecedented time. In early 2020, the Commonwealth of Kentucky was hit very hard by the COVID-19 pandemic. To date, almost 12,000 Kentuckians have been infected with COVID-19, and nearly 500 have died from it.[2] As a result of the COVID-19 pandemic, Kentuckians have been challenged on a multitude of levels. This lawsuit is about the challenge that the pandemic is forcing our democracy to confront.

---

[1] In addition to the facts outlined in this motion, the McGrath Campaign hereby incorporates all facts previously articulated in Original Plaintiffs' Verified Complaint (R. 1), its Emergency Motion for Restraining Order and/or Preliminary Injunction, including all attachments and declarations attached thereto (R. 4), Keisha Dorsey's proposed Verified Complaint (R. 19), and any supplemental declarations or evidence provided in support of those pleadings.

[2] Kentucky Coronavirus Monitoring (last updated June 13, 2020), https://govstatus.egov.com/kycovid19

Amy McGrath is running for the United States Senate and the primary election is only days away, set for June 23, 2020. The McGrath Campaign has a substantial interest in ensuring that the Campaign's members and supporters, and all voters in the Commonwealth, are provided access to the polls on Election Day and the ability to safely exercise their democratic right to participate in a free and fair election. To this end, the McGrath Campaign has invested substantial time and resources to ensure that voters are fully informed of their choices this election season, and are able to fully exercise their right to vote. In light of changes in how the election will be administered, it has been forced to divert resources toward educating voters about absentee and early voting, and has had to redirect the way its resources are being utilized to get people to the polls on Election Day despite voters' fear of long lines and problems which will undoubtedly arise as a result of consolidated voting sites.[3]

<u>COVID-19 in Kentucky and Kentucky Officials' Unprecedented Steps to Control It</u>

In an effort to protect the citizens of Kentucky, and to slow the spread of COVID-19, Kentucky's elected officials have taken extraordinary steps to limit personal contact between the Commonwealth's citizens. In light of the pandemic's threat, Secretary of State Adams recommended to Governor Beshear on March 16, that the primary election scheduled for May be postponed.[45] Governor Beshear accepted the recommendation and, in conjunction with the State

---

[3] Declaration of Mark Nickolas (attached hereto as <u>Exhibit A</u>).

[4] *KY Secretary of State recommends governor delay primary until June 23* (last updated on March 16, 2020), https://www.fox19.com/2020/03/16/ky-secretary-state-recommends-governor-delay-primary-until-june/

[5] The McGrath Campaign references a number of websites in support of its Motion, and asks that the Court take judicial notice of the same. *See Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 947 (6th Cir. 2020) ("Judicial notice of this message from the BMV website was appropriate because it is an official record from a government website."); *see also Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (2017).

Board of Elections, postponed the primary election to June 23, 2020.[6]  A few days later, on March 22, Governor Beshear issued a state-wide "Healthy at Home" order wherein he urged residents to practice "social distancing" to prevent the virus's spread.[7]  As part of this effort, Governor Beshear further ordered that all non-life-sustaining businesses cease in-person services, advised that schools should remain closed for the rest of the school year, and deployed both the National Guard and additional law enforcement to assist at hospitals and medical facilities.[8]  In light of the threat, Kentucky's General Assembly passed emergency legislation granting new powers to the Governor, the Secretary of State, and the Board of Elections to modify Kentucky's existing voting procedures during a state of emergency.  *See* H.B. 351 § 74(1)(l).

Pursuant to H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.  Before the Board of Elections proposed procedures may be put into practice, both the Secretary of State and the Governor must approve them.

On April 4, both Governor Beshear and the Kentucky Department of Public Health advised that Kentuckians should wear masks and practice social distancing to slow the virus'

---

[6] Ky. Office of the Governor, State of Emergency, Exec. Order No. 2020-296 (Apr. 24, 2020), https://governor.ky.gov/attachments/20200424_Executive-Order_2020-296_SOE-Relating-to-Elections.pdf

[7] Ky. Office of the Governor, State of Emergency, Exec. Order No. 2020-257 (Mar. 25, 2020), https://governor.ky.gov/attachments/20200325 Executive-Order 2020- 257 Healthy-at-Home.pdf

[8] Ky. Office of the Governor, Kentucky's Response to COVID-19 (May 17, 2020), https://governor.ky.gov/covidl9; Commonwealth of Kentucky, Gov. Beshear Advises Schools to Remain Closed to In-Person Instruction (Apr. 20, 2020), https://kentucky.gov/Pages/Activitystream.aspx?n=GovernorBeshear&prId=135.

spread.[9] On April 8, Governor Beshear issued an executive order limiting the number of people permitted inside essential businesses by restricting shopping trips to one adult per household at a time, and further announced the closure of some state parks.[10]  On April 21, Governor Beshear announced the "Healthy at Work" initiative to provide guidance to Kentucky businesses on when and how they could expect to safely reopen.  Under the plan, businesses could only begin to reopen after the Governor determined that Kentucky met delineated benchmarks related to the prevalence and spread of the disease, and the protections those businesses had in place.[11]  On April 23, Secretary of State Adams issued recommendations for how June elections were to be conducted.  The recommendations included a provision that did "empower all county clerks to reduce the number of sites for in-person voting…"[12]  On April 24, Governor Beshear issued an Executive Order directing the Board of Elections to promulgate regulations addressing the June elections with the aim of minimizing the spread of COVID-19.[13]

As COVID-19 infections plateaued within the Commonwealth, Governor Beshear began to reopen Kentucky's businesses.  On April 27, health care services and facilities were permitted to reopen on a limited basis on the condition that they complied with strict COVID-19 guidance.[14]  On May 4,  Governor Beshear announced that some additional businesses could reopen on May 11, provided again that those businesses complied with strict safety protocols to protect individuals from the spread of COVID-19.[15]  On May 7, Governor Beshear announced a tentative schedule for reopening more of Kentucky businesses.  Again, these re-openings were

---

[9] Kentucky's Response to COVID-19, https://governor.ky.gov/covid19 (last visited June 14, 2020)
[10] https://governor.ky.gov/attachments/20200408_Executive-Order_2020-275_State-of-Emergency.pdf
[11] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=136
[12] Letter from Sec of State Adams to Governor Beshear (Apr. 23, 2020),
https://governor.ky.goviattachments/20200423_Ltr-from-Sec-of-State-Adams.pdf.
[13] Ky. Office of the Governor, State of Emergency Relating to Kentucky Elections, Exec. Order
2020-296 (Apr. 24, 2020), https://elect.ky.gov/SiteAssets/Pages/default/EO%202020-296.pdf
[14] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=136

contingent on those businesses complying with strict safety protocols.  On May 15, the Governor announced that state parks would reopen on June 1.[16]  Gradually businesses have continued to reopen and life has begun to regain some semblance of normalcy but, as all Kentuckians know from listening to the Governor's daily press briefings, we are not out of the woods yet.  New cases continue to materialize every day, and many states are experiencing a spike a new COVID-19 infections.  In fact, the Kentucky's Department of Public Health confirmed 315 new cases in the Commonwealth on Saturday, June 13, 2020.[17]

In response to Governor Beshear's April 24 Executive Order postponing the primary election, the Board of Elections promulgated an Emergency Regulation, 31 KAR 4:190E (hereinafter, "Emergency Regulations"), to govern the primary election.  Relevant here, the Regulations provided:

    a.  The Emergency Regulations apply only to the Commonwealth's June 23, 2020 election.  (31 KAR 4:190E, Section 1).

    b.  The County Clerks shall transmit absentee ballots to voters who request an absentee ballot within seven (7) days of the request, but no later than June 16, 2020. (31 KAR 4:190E, Section 5)

    c.  All voters who wish to request a mailed absentee ballot must do so by 11:59 p.m. EST on June 15, 2020 (31 KAR 4:190E, Section 6)

    d.  Absentee ballots must be received by the County Clerk of the voter's county of registration no later than 6:00 p.m., local time, on June 23, 2020, in order to be counted, except that, absentee ballots delivered by the United States Postal Service and bearing a postmark of June 23, 2020 or an earlier date, shall be counted if received by 6:00 p.m., June 27, 2020. (31 KAR 4:190E, Section 6)

    e.  To assist County Clerks in managing the flow of receipt of voter-delivered absentee ballots, the State Board of Elections may purchase secure drop-boxes and provide them to County Clerks based on request and availability.  (31 KAR 4:190E, Section 7)

---

[15] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=152
[16] Kentucky's Response to COVID-19, https://governor.ky.gov/covid19 (last visited June 14, 2020)
[17] *See* KY COVID-19 Daily Summary 06/13/2020 (attached hereto as <u>Exhibit B</u>).

f. "County Clerks are directed to reduce the number of sites for in-person voting on June 23, 2020, with such reduction and such sites to be pre-approved by the State Board of Elections." (31 KAR 4:190E, Section 11)

g. All vote totals must be transmitted via "Certification, Official Count, Record of Election Totals" SBE 49, 11/03 to the Secretary of State's Office no later than 6:00 p.m., local time, June 30, 2020. (Section 16)[18]

In violation of the due process, the above referenced Emergency Regulations were noticed for a public hearing on July 31, 2020 at 10:00 AM with written comments due on the same date, notwithstanding the fact that the Emergency Regulations only apply to the conduct of the June 23 primary election.[19]  This has led to a situation where interested parties have no means of seeking relief from these restrictions outside coming to the Court to ask for emergency declaratory relief.

On June 3, 2020, the Kentucky Board of Elections conducted a meeting to consider the plans for the primary election.  At that meeting it became clear that, notwithstanding the clear and unavoidable threat that limited polling locations pose and the large crowds that will they will inevitably create, the Defendants have decided to limit voting to a single location inside each of their respective counties.  Defendant Clerk Blevins, of Fayette County, indicated that he did not wish to open more polling locations because if he did "people would use them," conceding that expanded in-person voting would increase turnout.  Mr. Blevins further suggested that his office anticipated the participation of 100,000 to 120,000 voters this election cycle, but had only received 46,000 requests for absentee ballots as of that date.[20]  Defendant Clerk Holsclaw, of

---

[18] Ky. Bd. of Elections, Procedures for June 23, 2020 Election, 31 Ky. Admin. Regs. 4:190E (2020) (available at https://www.sos.ky.gov/elections/Pages/2020-Primary-Updates.aspx)

[19] *Id.* at p, 11 ("Public Hearing and Comment Period"); KAR 13A.190(8) states if an emergency administrative regulation will not be replaced by an ordinary administrative regulation, the administrative body shall schedule a public hearing and public comment period pursuant to KRS 13A.270(1).

[20] Special Meeting of the Kentucky Board of Elections, June 3, 2020, https://www.youtube.com/watch?v=mwE74EqN9_w (last visited June 12, 2020), at 16:30-18:30.

Jefferson County, explained that she did not wish to open more polling locations, notwithstanding the fact that she anticipated up to 130,000 voters, but had only received 47,000 requests for absentee ballots as of that date. She acknowledged there would be long lines.[21] Defendant Clerk Summe, of Kenton County, likewise stated that she did not intend to open more than one polling location, but had only received 10,000 requests for absentee ballots as of that date.[22] In the end, the Kentucky Board of Elections approved the use of a single precinct in these counties and many more.

The County Board of Elections Defendants repeatedly suggested that this decision to limit polling locations was due, in part, to poll worker shortages, but this is simply not true. Many Kentuckians in these counties have volunteered to serve as poll workers, but have been turned down.  Liam May, a McGrath Campaign staffer had received messages from individuals interested in serving as poll workers.[23]  Mr. May spoke with County Clerks in both Jefferson and Madison County and was advised that neither county needed more poll workers.[24]  Mr. May also had individuals volunteer to serve as poll workers in Boone, Kenton, and Campbell counties.[25] Another McGrath Campaign staffer, Ashley Atkins, made efforts to recruit individuals willing to volunteer on Election Day after being told many counties were worried they would not have enough poll workers.[26]  After speaking with Fayette County Clerk Don Blevins, Jr., Ms. Atkins emailed a list of interested individuals to the Clerk's Office.[27]  Only a few days later, she received a response stating that Fayette County was not recruiting any new poll workers.[28]  If

---

[21] *Id*. at 18:30 – 41:00.
[22] *Id*. at 43:00 – 1:00:00.
[23] Declaration of Liam May (attached hereto as <u>Exhibit C</u>).
[24] *Id*. at ¶¶ 7-11.
[25] *Id*. at ¶ 12.
[26] Declaration of Ashley Adkins (attached hereto as <u>Exhibit D</u>).
[27] *Id*. at ¶¶ 7-8.
[28] *Id*. at ¶¶ 11-12.

these counties wanted to open more polling locations, there are individuals ready and willing to work the polls.

Recent Elections in Other States and COVID-19

Kentucky is not the only state facing serious dilemmas with how to allow citizens to vote, while also keeping them safe.  In light of the ongoing pandemic, states all around the country are struggling to provide access to the polls, while also maintaining the safety of voters.  The Center for Disease Control ("CDC") even issued guidelines for voting during the pandemic, recommending that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and *reduce crowd sizes at polling stations*."[29]  While Kentucky's elected and appointed officials have implemented many of these CDC measures, the decision to only provide voters with a single polling location in many of the Commonwealth's most populous counties will not reduce crowds; it will multiply them.  Notwithstanding significant efforts in other states to encourage absentee or early voting, substantial numbers of voters have nevertheless turned out to vote in-person on Election Day.

In Georgia, which just held its election on June 9, the election has been dubbed a "catastrophe."  According to reports, "[h]ours-long waits, problems with new voting machines and a lack of available ballots plagued primary voters in majority-minority counties in Georgia … conditions the secretary of state called 'unacceptable' and vowed to investigate."[30]  According to reports, "[i]n parts of Atlanta, lines snaked around the block and some people reported waiting

---

[29] CDC, Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019 ncov/community/electionpolling-locations.html

[30] Petra Cahill, Georgia's primary election 'catastrophe,' a surge in COVID-19 cases and George Floyd's legacy, https://www.nbcnews.com/news/morning-briefing/georgia-s-primary-election-catastrophe-surge-covid-19-cases-george-n1229076#anchor-Georgiaelectioncatastropheinlargelyminorityareassparksinvestigation (last visited June 12, 2020).

over four hours to vote."[31]  One news source shared that "the chairman of the Atlanta Public Schools Board of Education, waited in line for nearly three hours to vote Tuesday morning in Northwest Atlanta. Though he and his wife had both requested absentee ballots, only hers showed up before the primary."[32]   Reports also claim "[t]he troubles in Georgia were most harshly felt in heavily African American counties in and around Atlanta, where some defective machines set off scrambles for provisional ballots, which were in short supply."[33]

The recent primary election in Wisconsin was plagued by many of the same issues.  In the days leading up to the election, Wisconsin election officials faced a huge backlog of requests for absentee ballots and questions about voting absentee, including how to satisfy the state's registration requirements, how to properly request an absentee ballot, and how to return it in time to be considered.[34]  As a likely consequence of these deficiencies, there was "a dramatic shortfall in the number of voters on election day as compared to recent primaries" and "a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State."[35]   As explained in the New York Times, Wisconsin's decision to hold its election without sufficiently addressing these issues led to widespread disenfranchisement and electoral chaos.[36]   The Wisconsin Department of Health found that 52 people who voted under these conditions in Wisconsin later tested positive for COVID-19.   Furthermore, economists found a "statistically and epidemiologically significant

---

[31] *Id.*

[32] Fredreka Scouten and Gregory King, *'Always some sneaky trick': Black voters in Georgia say the state's primary meltdown was no accident*, https://www.cnn.com/2020/06/10/politics/georgia-voting-issues-black-voters/index.html (lasted visited June 12, 2020).

[33] *Id.*

[34] *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020)

[35] *Id.*

[36] Astead W. Herndon and Jim Rutenberg, Wisconsin Election Fight Heralds a National Battle Over Virus-Era Voting, N.Y. Times (Apr. 6, 2020),

association between in-person voting and the spread of COVID-19 two to three weeks after the election."[37]

Disproportionate Impact on Voters who are
Black, Elderly, Disabled, or Have a Health Conditions

The health risks of in-person voting this election season are especially severe for voters with underlying medical conditions, Black voters, older voters, and voters with disabilities.[38] Public health experts around the country have come to this conclusion. Dr. Anthony S. Fauci, Director of the National Institute of Allergy and Infectious Diseases, explained that Black Americans' increased likelihood of underlying medical conditions puts them "in the ICU and ultimately give[s] them a higher death rate."[39]

The inevitable result of consolidating the number of voting locations into one in such populous areas is a much greater chance of COVID-19 exposure for these voters. Many of the Original Plaintiffs fall into one of the above identified categories and have provided verified statements in support of this point. Mr. Howland is 72 years old and a Black voter that has chronic obstructive pulmonary disease ("COPD"), knee and back problems. COPD is a co-morbidity condition for COVID-19, meaning it puts him at a greater risk of death if he is infected with the virus. Mr. Howland desires to vote in person as he normally does, at an elementary

---

https://www.nytimes.com/2020/04/06/us/politics/wisconsin-primary-voting- coronavirus.html
[37] Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary* at 1-2, National Bureau of Econ. Research (May 2020), https://www.nber.org/papers/w27187.pdf.
[38] *See* Underlying Complaint, R. 1 at ¶¶ 55-72.
[39] Rashawn Ray, Why Are Blacks Dying at Higher Rates from COVID-19?, Brookings (Apr. 9, 2020), https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higherrates-from-covid-19/ ("Health disparities have always existed for the African American community," Fauci stated, and COVID-19 is "shining a bright light on how unacceptable that is because, yet again, when you have a situation like the coronavirus, they are suffering disproportionately."); Elizabeth Thomas & Dr. Nancy A. Anoruo, Coronavirus is Disproportionately Killing the Black Community. Here's What Experts Say Can Be Done About It, ABC News (Apr. 9, 2020), https://abcnews.go.com/Politics/coronavirus-disproportionately-killing-black-communityexperts/story?id=70011986

school that is close to his home in Jefferson County.  As a Black man with these medical conditions, Mr. Howland will be disproportionately impacted by the challenged practices.[40] Intervening Plaintiff Councilwoman Keisha Dorsey, is a Black Democrat in Jefferson County.[41] According to Councilwoman Dorsey, who represents Louisville Metro's 3rd District, approximately 82% of West Louisville's sixty-one thousand residents are minorities.[42] Councilwoman Dorsey expects a large turnout amongst Black voters on Election Day and anticipates that many in her district will be "disproportionately impacted by the current challenged, inequitable, and unfair practices, mechanisms and operations."[43]  These accounts are all supported by the opinion of Dr. Stephen Voss, that the Defendants' restrictions on in-person voting will have a substantial and disproportionate impact on minority communities, as well as the indigent.[44]

The impact on Black votes will be greatest in Jefferson and Fayette Counties as these are the communities with larger Black populations, and larger numbers of COVID-19 cases.  To this point, as of April, Black citizens comprised roughly 30% of Fayette County's 188 coronavirus patients, despite the fact that only 15% of the county's population is Black.[45]  Similarly, in Louisville, "Black people made up 23.5% of [Louisville]'s population in 2019…but constituted 42 percent of the deaths from the virus."[46]

---

[40] *Id.*
[41] Verified Complaint of Keisha Dorsey, R. 19-2, ¶14.
[42] *Id.*, ¶¶ 1, 4.
[43] *Id.*, ¶ 13.
[44] *See* Voss Declaration, R. 4-3.
[45] Beth Musgrave, *COVID-19 Has Hit Kentucky, Lexington's Black Population Especially Hard. Why?*, Lexington Herald Leader (Apr 9 , 2020), https://www.kentucky.com/news/local/counties/fayette-county/article241884161.html (last visited June 14, 2020)
[46] Jon Hale, *Kentucky Forms Regional Partnership, African American COVID-19 Deaths Rise in Louisville*, Louisville Courier Journal (Apr. 15, 2020), https://www.courier-journal.com/story/news/2020/04/15/coronavirus-kentucky-politics-heats-up-despite-beshears-stance/5136206002/ (last visited June 14, 2020)

Voters that are elderly, disabled, or have an underlying health condition will also be severely disenfranchised as a result of the plan advanced by Defendants. "People aged 65 years and older" are at higher risk for severe illness and death from COVID-19, because "[t]he immune systems of older adults weaken with age, making it harder to fight off infections," and "older adults commonly have chronic diseases that can increase the risk of severe illness from COVID-19." In fact, "[e]ight out of 10 deaths reported in the U.S. have been in adults 65 years or older."[47] As is the case with Mr. Howland, who has COPD, bad knees, and a bad back, individuals with underlying health conditions or disabilities will be in a very difficult position if they can only vote at a single polling location with long lines and large crowds. In addition, these populations will be adversely impacted because they are more likely to have transportation and employment barriers preventing them from travelling to a distant location or being away from work for extending periods of time.[48]

<u>General Burdens on Voters Right to Vote</u>

As has been seen in the other states that have restricted the number of polling sites, it is expected that lines in the populous Kentucky counties that are only providing a single voting location will be excessively long, leading many who intended to vote in-person to abstain from voting at all. In addition, Dr. Voss believes a single voting location will suppress voter turnout in large counties because it greatly increases the costs of voting.[49] Collectively, and particularly in light of COVID-19, the single polling location in Jefferson, Fayette, Kenton, Boone, Campbell, and other counties will burden Kentucky citizens' fundamental right to vote.

---

[47] CDC, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groupsathigher-risk.html
[48] Underlying Complaint, R.1, ¶¶ 58, 64, 70.
[49] Voss Declaration, R. 4-3, ¶ 5.

As a result of the Defendants decisions to limit the number of polling locations in their counties, many voters who either are uncomfortable with the idea of voting in a single location which will be plagued by large crowds and long lines in the heat of summer, have turned to absentee voting.  Many, however, have experienced extreme delays with absentee ballots.  For example, the McGrath Campaign's Finance Director Madison Cassell resides in Fayette County.  She requested an absentee ballot on May 26, but had not received that ballot as of June 14, 2020.[50]  Ms. Cassell does not want to vote at the single voting site in Fayette County, and she fears she will not be able to vote for the candidate that she supports.[51]  Nicholas Holt, who resides in Jefferson County, requested a ballot three weeks ago, but has yet to receive one.[52]  Mr. Holt is uncomfortable voting in person because of the risks presented by COVID-19 and large crowds gathered in a single voting location.[53]  Similarly, Mary Dean Brown, who resides in Jefferson County, requested a ballot three weeks ago, but has yet to receive one.[54]  Ms. Brown babysits a young grandchild and is uncomfortable voting in person because of the risks presented by COVID-19 and large crowds gathered in a single voting location.[55]

Others have tried to reach the County Clerk's Offices to remedy similar problems, but have been unable to obtain assistance.  For example, Charles Bowman is a resident of Jefferson County.  He tried calling the Clerk's office and was on the phone for over an hour.  He eventually went to the office to pick up a ballot, but was advised that he would have to call to make an appointment.  He explained his difficulties in making an appointment over the phone, but the Clerk's office advised him that the only way he could make an appointment was by

---

[50] Declaration of Madison Cassell (attached hereto as <u>Exhibit E</u>).
[51] *Id.* at ¶¶ 7-8.
[52] Declaration of Nicholas Holt (attached hereto as <u>Exhibit F</u>).
[53] *Id.* at ¶8.
[54] Declaration of Mary Dean Brown (attached hereto as <u>Exhibit G</u>).
[55] *Id.* at ¶6.

calling the office.  Mr. Bowman, who is 73 years old, does not have internet, and is uncomfortable voting in person because of the risks presented by COVID-19 and large crowds gathered in a single voting location.[56]  Ella Bross, another Kentucky residing in Jefferson County, has attempted to contact the Jefferson County Clerk and has not been able to do so. Ms. Bross does not have internet access to request a ballot.[57]  Furthermore, the McGrath Campaign received 21 calls to its voter protection hotline between May 30 and June 13, from similarly situated voters who lacked internet access and could not reach the Jefferson County Clerk's Office.[58]

While the Emergency Regulations require County Clerks to transmit absentee ballots within seven days of receiving the request, 31 KAR 4:190E (Section 5), Clerks have  apparently been unable to comply this quickly in many circumstances.  These delays disenfranchise voters, and necessarily exacerbate the problems which populous counties with a small number of voting sites will experience on Election Day.  To this day, it is unclear what will happen if these voters who requested, but have not received an absentee ballot, do not receive a ballot in time to postmark it by June 23, as required by the Emergency Regulations.  The same issue has already happened in Georgia, where citizens waited in long lines just to be turned away at the polls after requesting absentee ballots that never showed up in the mail.[59]

Other voters have requested absentee ballots, but received the wrong ballot in the mail. For example, Eli O'Neal, who is a staffer on the McGrath Campaign, applied for a Democratic

---

[56] Declaration of Charles Bowman (attached hereto as <u>Exhibit H</u>).
[57] Declaration of Ella Bross (attached hereto as <u>Exhibit I</u>).
[58] May Declaration, at ¶16.
[59] Kevin Collier, Cyrus Farivar, Dareh Gregorian and Ben Popken,  *Georgia election 'catastrophe' in largely minority areas sparks investigation* (June 9, 2020), https://www.nbcnews.com/politics/2020-election/georgia-secretary-state-launches-investigation-after-unacceptable-voting-problems-n1228541

Absentee Ballot, but received a Republican Ballot.[60]  This also happened to Original Plaintiff Barbara Heil.[61]  McGrath Campaign Staffer Alexandra Leventis had to leave the state as a result of a COVID-related emergency.[62]  She requested an absentee ballot on May 26, but has yet to receive a ballot.[63]  The Clerk's Office advised her it had been sent on June 2, but it never arrived. As a result of these problems, the Clerk's office cancelled her ballot and advised that a new one has been mailed, but she has not yet received it.[64]  Ms. Leventis is uncomfortable voting in person because of the risks presented by COVID-19 and large crowds gathered in a single voting location.  Furthermore, she is concerns even if she ventures out to the polling location, she may be turned away in light of the fact that an absentee ballot has already purportedly been issued to her.[65]

When some voters call their County Clerk's Office to request an absentee ballot they will be sent an application in the mail, which must be completed before a ballot is mailed to their residence.  This makes the process more burdensome in an already close timetable.  In other counties, however, voters can apply for an absentee ballot over the phone, after which a ballot is sent directly to their home.[66]  These issues with absentee ballots are all significant here, because there is a very real possibility that those voters who have not been able to obtain an absentee ballot will be left with no option but to vote in-person, further crowding what are already anticipated to be severely overcrowded sites.

These problems will have a significant impact on all voters in these populous counties, but as explained by Dr. Stephen Voss, the Defendants' restrictions on in-person voting will have

---

[60] Declaration of Eli O'Neal (attached hereto as <u>Exhibit J</u>).
[61] *See* Barbara Heil Declaration, R. 4-5.
[62] Declaration of Alexandra Leventis (attached hereto as <u>Exhibit K</u>).
[63] *Id*. at ¶¶ 4, 8.
[64] *Id*. at ¶¶ 9-11.
[65] *Id*. at ¶¶ 13-14.

a substantial and disproportionate impact on minority communities, as well as the indigent.[66]  He suspects that, by only providing a single voting site, that "15% of the Jefferson County electorate who would have turned out with the full range of polling-station options will not do so given only a single choice."[68]  It can be expected that there will be long lines at the in-person voting places, lasting multiple hours, and well into the night.  In order to alleviate this pressure, Dr. Voss explains that additional polling places are necessary to alleviate disenfranchisement in Kentucky's largest counties.[69]  While this disproportionate impact will be felt most strongly in communities with large minority populations, it is expected that all populous counties will experience the same type of disenfranchisement.  It is not too late, however, for Kentucky to both avoid the debacle that other states have experienced on Election Day and avoid the disenfranchisement of large segments of the voting population.

<u>Argument</u>

The Sixth Circuit generally considers the same factors when determining whether to issue a temporary restraining order or a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay.

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008).  These factors should be balanced and used to guide the Court's discretion. "[T]hey are not meant to be rigid and unbending requirements."  *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998) (internal citation omitted). *See also United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio*

---

[66] Nickolas Declaration, ¶ 7.
[67] *See* Voss Declaration, R. 4-3.
[68] *Id*. at ¶ 7.

*Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998) ("These factors are not prerequisites to issuing an injunction but factors to be balanced.")

The United States Supreme Court has noted that the "the standard for a preliminary injunction is essentially the same as for a permanent injunction." *Beverage Warehouse, Inc. v. Cent. Station (KY), LLC*, 2019 WL 1382496, at *2 (W.D. Ky. Mar. 27, 2019) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)). "In general, '[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that [for a preliminary injunction] the plaintiff must show a likelihood of success on the merits rather than actual success." *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (quoting *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010)).

## I.   INJUNCTIVE RELIEF IS NECESSARY TO PROTECT KENTUCKIAN'S <u>VOTING RIGHTS.</u>

### a.   <u>The McGrath Campaign is Likely to Succeed on the Merits.</u>

The McGrath Campaign has brought four claims against the Defendants: undue burden on the right to vote in violation of the First and Fourteenth Amendments, denial of due process, an equal protection violation, and a violation of Section 2 of the Voting Rights Act ("VRA"). These claims all relate to the challenged Emergency Regulations that disenfranchise voters during an unprecedented time.  For the reasons discussed below, the Campaign is likely to succeed on the merits of each claim.

#### i.   *Undue Burden on the Fundamental Right to Vote*

A court considering a challenge to a state election law must balance the injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise

---

[69] *Id.* at ¶ 7.

interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). This inquiry is highly fact-specific and the court applies a "flexible standard." *Id.* When voting rights are severely restricted, a law "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman*, 502 U.S. at 288–89).

"Our Constitution accords special protection for the fundamental right of voting." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). Historically, courts have recognized that disenfranchisement severely burdens the right to vote—and that even disenfranchising a small number of voters can give rise to a severe burden. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

The Emergency Regulations severely restrict Kentuckian's right to vote by forcing voters in these five populous counties to venture to the same polling site amidst a global pandemic. The CDC had issued guidance strongly encouraging voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations.[70] Kentucky still has

---

[70] CDC, Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019 ncov/community/electionpolling-locations.html

the Governor's guidance directing individuals to avoid gathering in groups of 10 or more.[71] Notwithstanding this guidance to stay home, quarantine as much as possible, and to not congregate in large groups, the Defendants intend to funnel tens of thousands of individuals through the same polling site in five of the largest counties in Kentucky.  While many voters who might have voted in-person have elected to vote absentee, many of the voters that have requested an absentee ballot are still facing difficulties getting that ballot due to significant backlogs of absentee ballot requests, and impending deadlines for those requests.  It is anticipated that the Defendants will argue that their interest in controlling the spread of COVID-19 justifies their respective decisions to have a single polling location, but this is neither a valid solution to the epidemic (as evidence by CDC and the Governor's guidance), nor is it a substantial enough state interest to deny citizens in these counties the right to vote.  As the state does not have a substantial interest sufficient to justify these severe restrictions on voting, they amount to violations of the First and Fourteenth Amendments.

*ii.*      *Procedural Due Process*

The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of … liberty … without due process of law." U.S. CONST. amend. XIV, § 1.  Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015).

Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F. 3d at 1192–93. Second, "courts must consider the 'fairness

---

[71] Gov. Beshear Updates Kentuckians on the Fight to Defeat COVID-19 (May 14, 2020),

and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id.* at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures. *Id.* (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, (quotation and citation omitted).

Here, Kentucky's Emergency Regulations for absentee voting must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.; see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted."). "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)).

For many of the reasons already articulated, corralling all voters into one polling facility during a global pandemic in five of the most populous counties is a deprivation of due process. As the challenged Emergency Regulations are inadequate in all respects, and substitute procedures are readily available to protect voters' rights with minimal burden to the Commonwealth, the challenged laws violate Kentucky voters' procedural due process rights in that the system the Commonwealth has put in place does not adequately protect the right to vote

---

https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=168

or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

Additionally, while the Emergency Regulations only apply to the June 23, 2020 election, the public hearing on these regulations is set for July 31, 2020 – over a month after the very Regulations become moot.  This public hearing is apparently scheduled because Kentucky regulations state if an emergency administrative regulation will not be replaced by an ordinary administrative regulation, the administrative body shall schedule a public hearing and public comment period pursuant to KRS 13A.270(1).  *See* KAR 13A.190(8).  Of course, any public concerns stated at a hearing *after* the primary election are futile since the Emergency Regulations only apply to this single election.  This is a denial of due process.

### iii.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from "denying to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision requires that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). The Equal Protection Clause applies to voting. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

Not too long ago, in *Michigan State A. Philip Randolph Institute v. Johnson*, the Sixth Circuit had the following to say regarding an equal protection challenge to restrictions on voting:

> "The right to vote is a 'precious' and 'fundamental' right," *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169

(1966)), and it is clear that this right " 'is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.' " *Id.* (quoting *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008)). Specifically, "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote." *Id.* (internal citations omitted).

833 F.3d 656, 662 (6th Cir. 2016).  In that case, the Plaintiffs argued that a Michigan law which eliminated straight-party voting would "increase waiting times at polling locations and will cause more voters to miscast ballots due to confusion." *Id.*  The district court granted the sought injunctive relief, and the Court of Appeals refused to issue a stay.  In part, the district court's opinion was informed by the fact that the elimination of straight-party voting would increase wait times, thereby imposing a burden on all voters, and particularly a disproportionate burden on Black voters.

The Emergency Regulations being challenged here will likewise cause severe disparities by and between voters.  First, as has been outlined in great detail in this Motion and the papers presented by the Original Plaintiffs, the regulations will lead to mass disenfranchisement of minority communities by requiring long commutes to the single polling location, and then causing long wait times when they finally arrive.  "In assessing the burden imposed on voters by a state's electoral mechanisms, courts may undoubtedly consider whether the state's practices will cause long lines and delays at polling places and how these lines and delays may impact the right of a voter to cast his or her ballot." *Johnson*, 833 F.3d at 665 (*citing League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008)).  Second, in light of the differing approaches taken by counties in the Commonwealth, in-person voting will be readily available to some Kentucky citizens at multiple locations within their counties, but not to others who will only have a single site.  Third, some Defendants are permitting voters to apply for absentee voting over the phone, while other Defendants will not permit such, instead sending a

22

paper application for an absentee ballot to the voter's home which then has to be returned prior to the June 15 deadline.  Each of these disparities does independently amount to a violation of equal protection.

### iv.  Section 2 Violation of the VRA

Section 2 of the Voting Rights Act of 1965 provides the following:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [52 USCS § 10303(f)(2)], as provided in subsection (b).

52 U.S.C. 10301(a).  "Importantly, 'Section 2, unlike other federal legislation that prohibits racial discrimination, does not require proof of discriminatory intent.'"  *Johnson*, 833 F.3d at 666–67 (quoting *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002)).  Rather, Section 2(b) provides that a violation of Section (a) is established when:

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

Black citizens of Kentucky have historically voted in-person.  According to Councilwoman Dorsey, who represents Louisville Metro's 3rd District, approximately 82% of West Louisville's sixty-one thousand residents are minorities.[72]  Councilwoman Dorsey expects a large turnout amongst Black voters on Election Day.[73]  Ms. Dorsey has been very involved in recruiting volunteers for Election Day because, she anticipates, significant voter confusion as a

---

[72] Verified Complaint of Keisha Dorsey, R. 19-2, ¶1.

result of the altered procedures in place.  Furthermore, Councilwoman Dorsey anticipates that many voters in her district will be "disproportionately impacted by the current challenged, inequitable, and unfair practices, mechanisms and operations."[74]

Large populations of Black voters reside in both Jefferson and Fayette counties, both of which have elected to only provide a single polling location on June 23.  As recognized by numerous individual declarants in this matter and Dr. Stephen Voss, the Defendants' restrictions on in-person voting will have a substantial and disproportionate impact on minority communities, as well as the indigent.  Accordingly, single polling locations in Fayette and Jefferson counties will have the effect of suppressing African American voters in violation of Section 2 of the Voting Rights Act of 1965 (52 U.S.C. 10301).

b.      The Remaining Factors Necessary to Obtain Injunctive Relief are also Satisfied.

The Emergency Regulations have harmed the McGrath Campaign, and will undoubtedly inflict irreparable harm on the voters of Kentucky. The most significant harm is in the disenfranchisement of large segments of the voting population. As the Sixth Circuit has held, disenfranchisement constitutes irreparable injury. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")  Once the election comes and goes, "there can be no do-over and no redress." *LOWV*, 769 F.3d at 247. If the election goes forward and a winner is declared, it will

---

[73] *Id*. at ¶ 4.
[74] *Id*. at ¶ 13.

simply be too late for the parties, or the Court, to take any actions to allow more voters access to ballots and the polls.

In addition, the way in which the Emergency Regulations are being implements with single voting sites creates serious and severe public health risks.  They operate to encourage determined voters in Kentucky's most populous counties to venture to their county's single polling station and interact face-to-face with a large number of people— despite that numerous governmental entities are warning against doing this very thing.  At worst, the Emergency Regulations risk exposing Kentuckians to a virus that has already claimed almost 500 lives in the Commonwealth and over 114,000 lives in the country.[75]  To date, no more than 10 people are allowed to gather in a crowd under guidance from Governor Beshear.[76]  Notwithstanding, the effect of the Defendants' decisions to have a single polling place will likely put thousands of voters together in the same location.

In light of the fact that voters, including members and supporters of the McGrath Campaign, face the inability to vote without exposing themselves to anticipated large crowds at polling sites, traditional legal remedies are inadequate. "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 858 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate.")

---

[75] CDC, Cases in the U.S. (Last updated on June 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
[76] Gov. Beshear Updates Kentuckians on the Fight to Defeat COVID-19 (May 14, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=168

The balance of the equities favors the McGrath Campaign. An injunction would protect the health of the public and prevent disenfranchisement by removing barriers to voting during a time of an unprecedented public health crisis.  On the other hand, these changes will admittedly be administratively inconvenient, but this mild inconvenience is outweighed by the vindication of constitutional rights. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) (holding "administrative convenience" cannot justify practices that impinge upon fundamental rights).

Finally, an injunction that is aimed to avoid disenfranchisement and protect public health is certainly in the public interest. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 859. "The vindication of constitutional rights . . . serve[s] the public interest almost by definition," including specifically when the right at issue is the right to vote. The public has a "strong interest in exercising the fundamental political right to vote."  *Purcell*, 549 U.S. at 4. In sum, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).

"The right to vote is too precious, too fundamental to be so burdened or conditioned." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966).  Thus, the Court should issue a preliminary injunction to allow Kentuckians with access to the polls on Election Day and the ability to safely exercise their democratic right to participate in free and fair elections.

II.     <u>The Relief Being Sought by the McGrath Campaign is Reasonable and Appropriate.</u>

The McGrath Campaign asks the Court to enter a Temporary Restraining Order/Preliminary Injunction which does Order and Enjoin the Defendants as Follows:

   1. That this Court issue a declaration that the single polling locations in Jefferson, Fayette, Kenton, Boone, and Campbell Counties (in addition to other large Kentucky counties) are unconstitutional, in contravention of

the First and Fourteenth Amendments of the United States, and violates the Voting Rights Act.

2. The Jefferson County Board of Elections shall open at least 16 geographically distinct polling locations for the primary election for in person voting on June 23, 2020.

3. The Fayette County Board of Elections shall open at least 9 geographically distinct polling locations for the primary election for in person voting on June 23, 2020.

4. The Board of Elections for Boone, Kenton, and Campbell Counties shall open no less than two (2) geographically distinct polling locations for the primary election for in person voting on June 23, 2020.

5. Hours for voting on Election Day shall be extended by three hours, 6:00 AM – 9:00 PM, local time.

6. The Jefferson, Fayette, Boone, Kenton, and Campbell County Clerks will make in-person early voting available to voters on all remaining weekdays (Monday-Friday) for no less than ten (10) hours per day between the date of the Court's Order and Election Day, June 23, 2020.

7. The Court retains jurisdiction to enter such further orders as may be deemed necessary.

<u>Conclusion</u>

At this time, the McGrath Campaign does not believe that an evidentiary hearing is necessary.  As time is of the essence, the Campaign suggests that the Court resolve this matter on the papers.  For the reasons discussed above, the Court should grant the McGrath Campaign's motion for injunctive relief.  A proposed order is attached hereto.

Respectfully submitted,

<u>*/s/ William H. Brammell, Jr.*</u>
William H. Brammell, Jr.
Kayla M. Campbell
DRESSMAN BENZINGER LAVELLE PSC
2100 Waterfront Plaza
321 West Main Street
Louisville, KY  40202
(502) 572-2500

*Counsel for the McGrath Campaign*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have served a copy of the foregoing by electronic service on all parties through the Court's electronic filing system on this 14th day of June, 2020.

<u>*/s/ William H. Brammell, Jr.*</u>
William H. Brammell, Jr.