IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | |
|---|---|
| Hon. JASON NEMES, *et al.* | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No.: 3:20-CV-407-CRS |
| | ) |
| CARL BENSINGER, *et al.* | ) |
| Defendants. | ) |

_____

## DEFENDANT SECRETARY ADAMS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PROPOSED INTERVENING COMPLAINT OF AMY MCGRATH FOR SENATE, INC.

Defendant Michael Adams, in his official capacity as the Secretary of State of the Commonwealth of Kentucky ("Secretary Adams"), for his memorandum in support of his motion to dismiss the proposed intervening complaint [D.E. 18-3] of Amy McGrath for Senate, Inc. (the "McGrath Campaign"), and pursuant to the Scheduling Order entered by the Court on June 13, 2020 [D.E. 22], states as follows.

## INTRODUCTION

Secretary Adams vigorously opposes, and seeks dismissal of, the injunctive relief sought by the McGrath Campaign that indisputably differs from, and far exceeds, the relief sought by the Voter Plaintiffs and Dorsey with respect to the single voting location and voting hours issues. Unbelievably, *the McGrath Campaign literally requests that this Court invalidate the entire "current system of absentee voting"* in the Commonwealth of Kentucky[1] – during a pandemic – including Emergency Regulation 31 KAR 4:190E (the "Emergency Regulation") promulgated by the SBE pursuant to Governor Andy Beshear's April 24, 2020 Executive Order 2020-296, which in turn incorporated Secretary Adams' April 23, 2020 recommendations. The Emergency

---

[1] D.E. 18-3, McGrath Campaign Intervening Complaint, at 23, Prayer for Relief ¶ A.

Regulation implements Governor Beshear's direction and Secretary Adams' recommendation to expand access to absentee ballots by allowing Kentucky voters to vote absentee due solely to "reasonable fear of infection or transmission" of COVID-19 during the current state of emergency. Thus, in the guise of protecting voters, the McGrath Campaign would have this Court invalidate mere days before the June 23 Primary Election the bipartisan agreement between Governor Beshear and Secretary Adams that _**expanded** **access to absentee voting**_. The McGrath Campaign's Intervening Complaint is a dangerous and unprecedented attack on Kentucky's elections and would have the perverse effect of denying thousands of Kentucky voters access to absentee ballots that would not exist in the absence of the Emergency Regulation which implemented the bipartisan agreement between Governor Beshear and Secretary Adams.

Furthermore, to the extent that the McGrath Campaign requests that this Court enter an injunction that would 1) extend the deadline to request absentee ballots to 11:59 a.m. on Friday, June 19, and order county clerks to mail absentee ballots to voters on Saturday, June 20 – *two U.S. mail days before the election* – and 2) permit campaign staff and volunteers to perform the governmental function of completing absentee ballot requests for voters over the phone, such relief would require not only invalidating the Emergency Regulation, but also violate longstanding Kentucky election laws that predate the pandemic. This additional injunctive relief would interfere in the administration of elections, which, by Kentucky law, are entrusted to the bipartisan SBE and the local county clerks.

The McGrath Campaign's effort to re-write Kentucky's election procedures on the eve of the primary election is fatally flawed. The McGrath Campaign lacks standing to intervene or to assert the claims set forth in the proposed Intervening Complaint that are distinct from the relief sought by all other Plaintiffs. The McGrath Campaign's direct challenge to the "current system of

absentee voting" and the Emergency Regulation is contrary to Kentucky law, and improperly seeks to inject complaints about the time, place, and manner of Kentucky's voting rules that, under U.S. Supreme Court and Sixth Circuit precedent, are entitled to deference and should not be invalidated under the circumstances. For these reasons, the McGrath Campaign's proposed intervening claims that seek to invalidate the absentee balloting procedures fail as matter of law and, therefore, cannot support the McGrath Campaign's request for injunctive relief and should be dismissed. Accordingly, Secretary Adams respectfully requests that this Court dismiss the McGrath Campaign's Intervening Complaint [D.E. 18-3].

## **FACTUAL BACKGROUND**

**I.    In Response to COVID-19, Governor Beshear and Secretary Adams Reach Bipartisan Agreement to Direct the Implementation of an Emergency Regulation.**

On March 16, 2020, acting pursuant to emergency powers granted the Office of the Secretary of State pursuant to KRS 39A.100(l), and as a consequence of the public health emergency declared by Governor Beshear regarding the COVID-19 pandemic, Secretary Adams formally recommended to Governor Beshear that the elections scheduled for May 19—the Democratic and Republican primaries, plus special and local option elections around the state— be delayed by 35 days, to June 23.[2] Acting on Secretary Adams' recommendation, Governor Beshear signed Executive Order No. 2020-236 that same day, which officially delayed the May 19 elections to June 23.[3]

On April 1, in response to the COVID-19 pandemic and in recognition of the need to grant Kentucky officials additional flexibility in conducting a statewide election during same, the

---

[2] *See* Press Release, *Secretary of State Moves to Delay May 19 Elections*, available at:
https://kentucky.gov/Pages/Activity-stream.aspx?n=SOS&prId=300 (last accessed June 14, 2020)
[3] *See* Executive Order No. 2020-236 (March 16, 2020), available at:
https://governor.ky.gov/attachments/20200316_Executive-Order_2020-236_Elections.pdf (last accessed June 14, 2020).

Kentucky General Assembly passed emergency legislation to amend and expand the Governor's

and Secretary of State's emergency powers under KRS Chapter 39A, as follows:

> Upon the recommendation of the Secretary of State, to declare by executive order a different time*[, or]* place*, or manner* for holding elections in an election area for which a state of emergency has been declared for part or all of the election area. The election shall be held within thirty-five (35) days from the date of the suspended or delayed election. The State Board of Elections shall establish procedures for election officials to follow. ***Any procedures established under this paragraph shall be subject to the approval of the Secretary of State and the Governor by respective executive orders.*** [4]

On April 13, the Governor vetoed select portions of the legislation, but the General Assembly

overrode the veto and the bill became law on April 15.

On April 23, Secretary Adams, again acting pursuant to the powers granted to his office by

KRS 39A.100(l), issued detailed recommendations to Governor Beshear for conduct of the

elections now set for June 23. Secretary Adams' recommendations included the following:

> 2.  The State Board of Elections by emergency regulation shall provide that it defines the term "medical emergency," undefined by Kentucky Revised Statutes section 117.077, to include "a reasonable fear of infection or transmission during a state of public health emergency declared by the Governor."
>
> 3.  The State Board of Elections by emergency regulation shall provide that, notwithstanding Kentucky Revised Statutes section 117.077, an application for an absentee ballot due to a medical emergency a) shall not require the applicant to state that the emergency condition occurred within 14 days of the election, b) need not be notarized, and c) shall entitle the applicant, upon verification of the application, to vote absentee, by mail or in person, if otherwise a lawful voter….
>
> 6.  The State Board of Elections by emergency regulation shall empower all county clerks to reduce the number of sites for in-person voting on June 23, 2020. . . .
>
> 14.  Absentee ballots must be received by the county clerk of the voter's county of registration no later than 6:00 p.m., local time, on June 23, 2020, excepted

---

[4] H.B. 351 § 74(1)(l).

that an absentee ballot postmarked on or before June 23, 2020 may be accepted until 6:00 p.m., local time, June 26, 2020. . . . [5]

The next day, April 24, acting on Secretary Adams' recommendations, Governor Beshear issued Executive Order 2020-296, which provided in full:

1.  All Kentuckians should utilize absentee voting by mail for the June 23, 2020 primary election if they are able to do so.

2.  The State Board of Elections shall promulgate emergency regulations to provide for such expanded absentee voting by mail. The State Board of Elections shall, among other changes, create a secure online portal that will allow voters to request the absentee ballot be mailed to them. The State Board of Elections shall send a postcard to each registered voter informing voters of the ability, and the process, to vote absentee by mail in the June 23, 2020 primary election.

4.  The State Board of Elections shall promulgate such additional emergency regulations as are necessary to ensure that Kentuckians can safely exercise their right to vote in the June 23, 2020 primary election, while protecting the safety of Kentucky's county clerks and poll workers. The additional regulations **shall be consistent with the April 23, 2020 recommendation of Secretary of State Adams**, **which are incorporated by reference herein**. The regulations shall be subject to further approval as required by law. [6]

Taken together, Secretary Adams' April 23 recommendations and Governor Beshear's April 24 Executive Order No. 2020-296 are a **bipartisan compromise** that both protects voters' health and ensures they are able to vote, by expanding access to absentee voting, permitting any voter with a "reasonable fear" of COVID-19 – in essence, any voter – to request an absentee ballot without notarization or submission of the SBE's standard medical emergency documentation.

## II.   SBE Issues Emergency Regulation 31 KAR 4:190E Implementing Governor Beshear's Executive Order and Secretary Adams' Recommendations.

---

[5] *See* April 23, 2020 Letter from Secretary Adams to Governor Beshear, available at: https://newsroom.ky.gov/SOS/PressReleasesAttachments/Attachments/310/recommendation%20to%20beshear%20on%20primary.pdf (last accessed June 14, 2020).
[6] Executive Order No. 2020-296 (April 24, 2020), available at: https://governor.ky.gov/attachments/20200424_Executive-Order_2020-296_SOE-Relating-to-Elections.pdf (last accessed June 14, 2020)(emphasis added).

On May 1, in response to Governor Beshear's Executive Order and Secretary Adams'
recommendations, SBE promulgated the Emergency Regulation, 31 KAR 4:190E. The Emergency
Regulation tracks Secretary Adams' recommendations incorporated by Governor Beshear's
executive order. The Emergency Regulation provides, in relevant part:

> Section 2. Definitions. All terms used herein shall have the same definitions as
> currently stated in the Kentucky Revised Statutes and Kentucky Administrative
> Regulations. However, the term "medical emergency," established by but
> undefined in KRS 117.077, is defined to include a reasonable fear of infection or
> transmission during a state of public health emergency declared by the Governor.

> Section 3. Notwithstanding KRS 117.077, an application for an absentee ballot due
> to medical emergency a) shall not require the applicant to state that the emergency
> condition occurred within 14 days of the election, b) need not be notarized, and c)
> shall entitle the applicant, upon verification of the application, to vote by absentee,
> by mail or in person by appointment, as advised, if otherwise a lawful voter….

> Section 6. A voter shall request a mailed absentee ballot from the County Clerk of
> that voter's residence by 11:59 p.m. EST June 15, 2020. . . . Absentee ballots must
> be received by the County Clerk of the voter's county of registration no later than
> 6:00 p.m., local time, on June 23, 2020, in order to be counted, except that, absentee
> ballots delivered by the United States Postal Service and bearing a postmark of June
> 23, 2020 or an earlier date, shall be counted if received by 6:00 p.m., June 27, 2020.

> Section 7. [. . .] A voter may deliver an absentee ballot to the office of the County
> Clerk in the county where the voter is registered, rather than mailing the ballot via
> the United States Postal Service. To assist County Clerks in managing the flow of
> receipt of voter-delivered absentee ballots, the State Board of Elections may
> purchase secure drop-boxes and provide them to County Clerks based on request
> and availability. Each drop-box must be secured inside a main or satellite office of
> a County Clerk, or otherwise inside a county courthouse, and must at all times be
> visible by County Clerk staff….

> Section 10. All County Clerks shall make their offices and telephone lines available
> for the purpose of allowing registered voters of their respective counties to schedule
> appointments to vote absentee in-person by appointment beginning no later than
> June 8, 2020 and ending June 22, 2020, no fewer than 5 days per week in the two
> weeks before the week of election day. . . .

> Section 11. Notwithstanding any statute or regulation to the contrary, County
> Clerks are directed to reduce the number of sites for in-person voting on June 23,
> 2020, with such reduction and such sites to be pre-approved by the State Board of
> Elections. . . . [E]very reasonable effort shall be undertaken by County Clerks to
> see that in-person voting is implemented in a manner that limits direct contact

6

between voters, other voters, and election officials, and shall be conducted from 6:00 a.m. to 6:00 p.m. local time as required by law. [7]

Because the Emergency Regulation required the SBE to pre-approve all counties' plans for reduction of voting locations, among other things, on June 3 the SBE convened a special meeting and its voting members approved the use of single voting locations in Boone, Campbell, Fayette, Jefferson and Kenton Counties ("the Subject Counties") over Secretary Adams' explicit objection. [8]

On June 12, the McGrath Campaign moved to intervene in this matter, and filed a proposed intervening complaint; however, the McGrath Campaign seeks a separate judgment ordering much different injunctive relief than all other Plaintiffs sought: [9] in addition to the expansion of voting locations and/or hours in the Subject Counties, McGrath Campaign directly challenges the very validity of the Emergency Regulation – that is, challenges the expansion of absentee voting during a pandemic – and thus the bipartisan agreement reflected in Governor Beshear's Executive Order No. 2020-296 and Secretary Adams' April 23 recommendations. Specifically, the McGrath Campaign asks that this Court declare unconstitutional the entire "current system of absentee voting," and order, among other requests, the following injunctive relief:

1. Require Defendants to "place additional staff in the County Clerks' offices to provide [absentee] ballots to voters" and "[e]xtend the deadline to request an absentee ballot to June 19, 2020, at 11:59 a.m. EDT, and require that all ballots be mailed by the Defendants to voters by June 20, 2020," just two U.S. mail days before the election.

2. "Alternatively [to 1.], requir[e] Defendants permit campaigns, volunteers, or other civic organizations to complete ballot requests for voters over the phone, just as Clerks are permitted to do, and extend the deadline for requesting a ballot to June

---

[7] 31 KAR 4:190E, available at: https://newsroom.ky.gov/SOS/PressReleasesAttachments/Attachments/311/SBE%20Covid19%20Emergency%20Regulation.pdf (last accessed June 14, 2020).
[8] *See supra* Note 1.
[9] *See* D.E. 18, McGrath Campaign Motion to Intervene; *see generally* D.E. 18-3, McGrath Campaign Intervening Complaint, at 23, Prayer For Relief.

19, 2020, at 11:59 a.m. EDT, and require that all ballots be mailed by the Defendants to voters by June 20, 2020," just two U.S. mail days before the election.

Require Defendants "to [provide] secure drop boxes . . . that are accessible twenty-four hours a day, seven days a week for voters to return their completed absentee ballot."[10]

On April 24, the very day that the Governor and Secretary of State announced their joint plan, Amy McGrath called it "a win for democracy."[11] Subsequently, the McGrath Campaign broadcast a radio ad, titled "A Lot Easier," that stated in pertinent part: "A lot of Kentuckians don't know how voting's gonna work this year because of the coronavirus. But Governor Beshear has made it a lot easier for you. You never have to leave your home."[12] But now, a month-and-a-half after the SBE promulgated the Emergency Regulation implementing a high-level, bipartisan agreement to save the election, and just one business day before the absentee ballot request deadline, <u>the McGrath Campaign is trying to blow the whole thing up</u>.

The McGrath Campaign's proposed Intervening Complaint improperly requests that this Court rewrite the statutory and regulatory rules for absentee voting mere days before the June 23 election in a way that the McGrath Campaign finds desirable. For this reason and others set forth below, the McGrath Campaign's Intervening Complaint should be dismissed.

## LEGAL STANDARD

This Court should dismiss the McGrath Campaign's proposed Intervening Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction as the McGrath Campaign is without Article III standing, and/or Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief may be granted. "Subject matter jurisdiction is always a threshold

---

[10] *See id.* at ¶¶ A, C, D.
[11] Lexington Herald-Leader, "Beshear allows all Kentuckians to use absentee voting by mail in June primary," April 24, 2020, at https://www.kentucky.com/news/politics-government/article242260896.html.
[12] The ad may be found at https://www.youtube.com/watch?v=7fP4L7cIkk0&feature=youtu.be.

determination." *Anthony v. Murdock*, Civil Action No. 3:16-cv-00550-RGJ, 2019 U.S. Dist. LEXIS 20790, at *3 (W.D. Ky. Feb. 8, 2019). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Bauer v. RBX Indus. Inc.*, 368 F.3d 569 (6th Cir. 2004), *overruled on other grounds by Winnett v. Caterpillar, Inc.*, 553 F.3d 1000 (6th Cir. 2009). "At the pleading stage, plaintiffs bear the burden of alleging facts establishing each element of standing." *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020). A plaintiff "must plead its components with specificity." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999). "If Plaintiffs cannot establish constitutional standing, their claims must be dismissed for lack of subject matter jurisdiction." *Loren v. Blue Cross & Blue Shield*, 505 F.3d 598, 607 (6th Cir. 2007).

Furthermore, a court may dismiss a complaint pursuant to Rule 12(b)(6) if the plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The Court must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true, but the factual allegations must "raise a right to relief above the speculative level." *Id*. at 555. The complaint must "contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (internal quotations omitted). Failure to include plausible factual allegations for all material elements necessary for recovery warrants dismissal. *Id*.

## ARGUMENT

I.     **The Intervening Complaint Should Be Dismissed Pursuant to Rule 12(b)(1) Because The McGrath Campaign Cannot Demonstrate Standing.**

The McGrath Campaign's proposed Intervening Complaint should be dismissed because the McGrath Campaign cannot demonstrate either organizational or associational standing to bring

claims for injunctive relief unrelated to the single voting location and voting hours issues set forth in the Voter Plaintiffs' Complaint and Dorsey's Intervening Complaint.

### A.    The McGrath Campaign Cannot Demonstrate Organizational Standing.

To establish organizational standing, a plaintiff organization must establish the three traditional elements of Article III standing. *See Shelby Cty. Advocates for Valid Elections v. Hargett*, 2019 U.S. Dist. LEXIS 156740, *14 (W.D. Tenn. 2019). Under the *Lujan* elements, "the organization must establish that it suffered an injury in fact, that the injury is fairly traceable to the conduct of the defendant and that the injury can be remedied by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). However, "plaintiffs seeking injunctive or declaratory relief face a higher burden." *Id.* In addition to the *Lujan* elements, "plaintiffs seeking injunctive or declaratory relief must show 'actual present harm or a significant possibility of future harm.'" *Id.* (citing *Vaduva v. City of Xenia*, 2019 U.S. App. LEXIS 23567, at *6 (6th Cir. Aug. 7, 2019) (quoting *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 833 (6th Cir. 2001)).

While the McGrath Campaign alleges that it has been injured, none of the identified "injuries" actually demonstrate the "actual present harm or a significant possibility of future harm" required to establish organizational standing for injunctive relief. Specifically, the McGrath Campaign asserts that the Emergency Regulation's June 15, 11:59 p.m., deadline to request absentee ballots—which is substantially similar to the deadline established by KRS 117.085, close of business on the seventh day before the election—has "forced" the McGrath Campaign to "divert[] resources toward educating voters about absentee voting and early voting, and has had to redirect the way its resources are being utilized to get people to the polls on Election Day despite voter fears of long lines and voting problems exacerbated by the Emergency Regulation at issue."[13]

---

[13] D.E. 18-3, Intervening Complaint, ¶ 15.

The McGrath Campaign wrongly asserts that "[r]edirecting resources to educate voters about complying with new registration laws is an injury sufficient to meet organizational standing."[14]

The McGrath Campaign's only claimed injury—the diversion of resources to address an increase in absentee voting—is a facially insufficient injury to establish organizational standing. Much like the plaintiff in *Hargett*, 947 F.3d 977, the McGrath Campaign alleges the ***identical set of injuries*** that the Sixth Circuit explicitly rejected as sufficient to establish standing. *Id.* at 980-982. In other words, the McGrath Campaign can "***no more spend its way into standing based on speculative fears of future harm than an individual can***." *Id.* at 982 (emphasis added).

Indeed, the McGrath Campaign has alleged no specific injury demonstrating that the alleged diversion of resources has ***harmed its purpose or core mission in any way***. The McGrath Campaign is a not-for-profit political corporation organized under Section 527 of the Internal Revenue Code whose ***sole legal purpose*** is to "directly or indirectly accept[] contributions or mak[e] expenditures, or both," for "the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office." 26 U.S.C. § 527(e)(1)-(2). The McGrath Campaign has not alleged that the challenged Emergency Regulation is causing it to divert resources away from the sole purpose for which it exists—to accept contributions and/or make expenditures for the function of influencing the selection of Amy McGrath as the Democratic nominee for U.S. Senate.

The McGrath Campaign alleges that it has "diverted resources toward educating voters about absentee voting and early voting, and has had to redirect the way its resources are being utilized to get people to the polls on Election Day despite voter fears of long lines and voting problems exacerbated by the Emergency Regulation at issue here." In other words, the McGrath

---

[14] *Id.* (citing *One Wisconsin Institute, Inc. v. Nichol*, 186 F. Supp. 3d 958 (W.D. Wis. 2016)).

Campaign alleges that the regulation is causing it to simply ***readjust the allocation of expenditures*** ***it otherwise would make, and is legally only able to make, for the sole purpose of electing Amy*** ***McGrath***. In other words, the McGrath Campaign has not actually "diverted" resources in any way because, legally, it can only expend funds for a singular purpose—to further the election of Amy McGrath. That the Emergency Regulation allegedly caused the McGrath Campaign to adjust how it expends funds among various efforts to turn out voters in support of electing Amy McGrath is simply not harmful to the McGrath Campaign as a matter of law. Indeed, otherwise any campaign could stop the enactment of any election law or promulgation of any election regulation simply because a change in state policy could necessitate a change in campaign strategy. Whether it is expending resources to turn out voters in-person or to encourage them to cast absentee ballots, those resources are being deployed in furtherance of electing Amy McGrath, which, again, is the sole purpose for which the McGrath Campaign exists under the Internal Revenue Code.

### B.     The McGrath Campaign Cannot Demonstrate Associational Standing.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim requested nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). Regarding the first element, it generally suffices for an association to demonstrate "***at least one of [its] members would have standing to sue on his own***." *United Food*, 517 U.S. at 554-55 (citing *Warth*, 422 U.S. at 511) (emphasis added). But "a plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 547, 352 (2006), and "a plaintiff must demonstrate standing separately for each form of relief sought." *Id.* (*quoting Friends of the Earth*, 528 U.S. at 185). An association must follow these

same black-letter rules. In *Summers v. Earth Island Institute*, the Supreme Court affirmed "***plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm.***" 555 U.S. 488, 498 (2009) (emphasis added). Any other "novel approach would make a mockery of our prior cases." *Id.* In addition, "[t]he individual participation of an organization's members is 'not normally necessary when an association seeks prospective or injunctive relief for its members'", but that does not relieve the organization from asserting that ***its actual members will be injured***." *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004) (emphasis added).

The McGrath Campaign fails to demonstrate that it has associational standing. According to the Intervening Complaint, the McGrath Campaign claims that it has associational standing on behalf of its supporters because "supporters of the campaign have standing to sue in their own right because many supporters have not obtained the ability to vote early or with an absentee ballot, despite their best efforts."[15] The McGrath Campaign alleges that as a result, "voters with health concerns, transportation complications, difficulties accessing the internet, or those unable to contact the County Clerk by phone will not have an opportunity to vote in-person or otherwise."[16] Ultimately, the McGrath Campaign asserts that "many voters will not have the ability to express support of their chosen candidate as a result of there being only one polling station in these Counties, and because of the restrictions placed on absentee ballots."[17]

However, the McGrath Campaign fails to allege that it has any actual members. Because the McGrath Campaign has no actual members, it cannot demonstrate that any of its members will be injured in any way. At most, the McGrath Campaign seeks injunctive relief on behalf of a

---

[15] D.E. 18-3, Intervening Complaint, ¶ 17.
[16] *Id.*
[17] *Id.*

nebulous number of individuals who either "want" to vote for McGrath or "may" vote for McGrath. Such a broad and unidentifiable group of individuals is not sufficient to establish membership in an organization. "The Supreme Court has not seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties *whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership*." *Hope, Inc. v. County of Du Page*, 738 F.2d 797, 814 (7th Cir. 1984) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) (emphasis added)." Neither 'desiring' to vote for a candidate nor actually voting for that candidate constitutes membership or the substantial equivalent of membership in a political party." *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 755, 811 (S.D. Ind. 2006).

In *Rokita*, the plaintiff, the Indiana Democratic Party, "broadly contend[ed] that they 'have standing to assert the rights of those registered voters who associate with them and who will be voting, or who desire to vote, in future elections for public office." *Id.* This assertion was "premised on the claim that the mere act of 'desiring' to vote for a Democratic candidate makes an individual a 'member' of the Democratic party." *Id.* The court disagreed with the plaintiff and found the plaintiff's assertion "a bridge too far in view of applicable law." *Id.* Recognizing that the Supreme Court does not recognize representational standing other than to associations which represent actual membership with the association, the court determined that the "Democrats' attenuated claim of 'membership' for any voter who will be voting or desires to vote for a Democratic candidate fails to confer standing to bring [the] suit." *Id.* Similarly, in *Green Party of Tenn. v. Hargett*, 2014 U.S. Dist. LEXIS 102706 (E.D. Tenn. 2014), the court found that no associational standing could be conferred: because the Green Party "has no members, the alleged injury is far more speculative and remote, and the voters denied the ability to vote … are simply alleged to be

voters who predominantly identify with a particular political point of view, not that they would specifically identify with the views of the Green Party." *Id.* at *41-42.

Identically to *Rokita* and *Hargett*, the McGrath Campaign fails to demonstrate associational standing because it cannot demonstrate that it has any members. Instead, as in *Hargett*, the McGrath Campaign claims to generally represent "voters" and "supporters of the campaign."[18] The "mere act" of "desiring" to vote for a certain candidate is too attenuated to be considered "membership" sufficient to establish associational standing. *See Rokita*, 458 F. Supp. at 811. Thus, the McGrath Campaign wholly fails to demonstrate the requisite associational standing to assert the Intervening Complaint.

## II.     The Intervening Complaint Fails As A Matter of Law.

Even assuming that the McGrath Campaign has demonstrated standing—which it has not—the Intervening Complaint fails as a matter of law. Specifically, the McGrath Campaign alleges that the Emergency Regulation's various procedures with respect to absentee voting is: (1) an undue burden on the right to vote; (2) a denial of procedural due process; and (3) a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (Intervening Complaint, ¶¶ 81-91). However, each cause of action alleged by the McGrath Campaign fails as a matter of law.

### A.  The McGrath Campaign Fails To Establish That The Emergency Regulation Creates An Undue Burden On The Right to Vote.

The McGrath Campaign fails to establish that the Emergency Regulation's June 15 absentee ballot request deadline and limitation of ballot dropboxes to secure, supervised locations

---

[18] D.E. 18-3, Intervening Complaint, ¶ 17.

unduly burden the right to vote.[19] First, the McGrath Campaign alleges that without the extension of the absentee ballot request deadline – which comes a mere week before the election and provides for adequate time for absentee ballots to be issued, mailed, and returned timely – "significant backlog of requests for absentee ballots, and delays in getting those absentee ballots to voters" will put Kentucky voters at a "high risk of not being able to register in time for absentee voting by the June 15 deadline, or will otherwise be unable to receive their ballots with sufficient time to return said ballot to the Defendant Clerks prior to the June 27 deadline." (Intervening Complaint, ¶ 84).[20] Ironically, the McGrath Campaign's requested relief would insert *more* uncertainty and contribute to voters being "unable to receive their ballots with sufficient time to return said ballot" with a proposed *mail-out* date of absentee ballots just two mail days before the election, leaving little time for them to be filled out and returned.

Under the *Anderson-Burdick*[21] test, the Emergency Regulation—which were promulgated pursuant to Kentucky's valid authority to regulate elections—do not unduly burden Kentuckians' right to vote. While the Supreme Court has "readily acknowledged the general right to vote as 'implicit in our constitutional system,' … the 'right to vote in any manner … [is not] absolute." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626 (6th Cir. 2016) (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). Instead, "the Constitution recognizes the states' clear prerogative to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'"

---

[19] The McGrath Campaign appears also to challenge state policy of permitting only county clerks' staff to facilitate absentee ballot requests, but does not cite any portion of the Emergency Regulation as purportedly being unconstitutional.

[20] Section 6 of the Emergency Regulation provides that "[a]bsentee ballots must be received by the County Clerk of the voter's county of registration no later than 6:00 p.m., local time, on June 23, 2020, in order to be counted, except that absentee ballots delivered by the United States Postal Service and bearing a postmark of June 23, 2020 or an earlier date, shall be counted if received by 6:00 p.m., June 27, 2020."

[21] *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).

*Id.* (citing U.S. Const. Art. I, § 4, cl. 1). Thus, "[f]ederal law thus generally defers to the states' authority to regulate the right to vote." *Id.* (citing *Crawford*, 553 U.S. at 203-04).

Furthermore, where there exists a "constitutional challenge to an election regulation," the court applies the *Anderson-Burdick* framework to determine the permissibility of a regulation, which involves the following considerations:

> [T]he court must first consider the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate. Second, it must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. Finally, it must determine the legitimacy and strength of each of those interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.* at 626-27 (citing *Hargett*, 791 F.3d at 693). In addition, if a state imposes "severe restrictions" on a plaintiff's constitutional rights, its regulations survive only if "narrowly drawn to advance a state interest of compelling importance." *Id.* at 627. On the other hand, "minimally burdensome and nondiscriminatory" regulations are subject to a "less-searching examination closer to rational basis" and the State's "important regulatory interests are generally sufficient to justify the restrictions." *Id.* (citing *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citing *Hargett*, 767 F.3d at 546, and quoting *Burdick*, 504 U.S. at 434). Regulations falling "somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'" *Id*. (citing *Hargett*, 767 F.3d at 546).

Here, the Emergency Regulation is a valid regulation promulgated pursuant to Kentucky's authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." *Id.* at 526. Accordingly, the Court should defer to Kentucky's authority to regulate the right to vote. Regardless, the Emergency Regulation undoubtedly passes scrutiny

under the *Anderson-Burdick* test. As a preliminary matter, the Emergency Regulation's June 15 deadline—which does not place "severe restrictions" on a voter's right to vote—is a "minimally burdensome and nondiscriminatory" regulation that is subject to a rational basis review. Under the first *Anderson-Burdick* element, the "character and magnitude of the asserted injury to the rights protected by the Constitution that the plaintiff seeks to vindicate," the Emergency Regulation does not injure voters, but actually *expands* Kentuckians' access to voting by: (1) allowing *any* voter who desires to vote via absentee ballot to request, and subsequently vote by, an absentee ballot; and (2) extending the deadline to request an absentee ballot to June 15 instead of the original *May 12, 2020 deadline* established by 31 KAR 4:160, section 7, subsection 4(c), which the Emergency Regulation suspended.[22] Importantly, without the promulgation of the Emergency Regulation, the deadline to request an absentee ballot *would have remained on May 12, 2020 despite the postponement of Election Day to June 23, 2020*. Thus, the Emergency Regulation not only does not injure any right protected by the Constitution, but rather it expands Kentuckians' access to the ballot box.

With respect to the second *Anderson-Burdick* factor, "the precise interests put forward by the State as justifications for the burden imposed by its rule," the Commonwealth clearly has an interest in requiring its voters to request an absentee ballot by a certain date in order to give the county clerk sufficient time to process the request and mail the ballot, such that it can be returned timely and the vote counted. Finally, under the third *Anderson-Burdick* factor, which requires a balancing of the "legitimacy and strength" of each party's interest, it is clear that the Commonwealth's interest in allowing sufficient time for Kentuckians to receive their absentee

---

[22] Section 1 of the Emergency Regulation suspended preexisting regulatory language at 31 KAR 4:160, section 7, subsection 4(c), as follows: "Voting on the rescheduled election day shall be accomplished by physically appearing at the voting place. The time set by law for casting [an] absentee . . . ballot shall not be extended by the executive order rescheduling the election."

ballots far outweighs any alleged injury claimed by the McGrath Campaign. On the other hand, Kentuckians have suffered no injury as a result of the Emergency Regulation's June 15 deadline to request an absentee ballot.

Similarly, the Emergency Regulation's permission to county clerks to provide secured, supervised ballot dropboxes—which are paid for by the Commonwealth, for voters who may not have confidence in the postal service—passes scrutiny under the *Anderson-Burdick* test. Again, much like the Emergency Regulation's June 15 deadline requirement, the security requirements for dropboxes do not place "severe restrictions" on a voter's right to vote, and therefore, are subject to rational basis review. *See id.* Under the first *Anderson-Burdick* element, the McGrath Campaign wholly fails to demonstrate any "asserted injury to the rights protected by the [Constitution]," as the ballot dropboxes do not injure—but actually *expand*—voting access to Kentuckians. Due to the ballot dropboxes, voters may hand-deliver their ballots, rather than mail them, to their county clerks. The Emergency Regulation's offering of secured, supervised ballot dropboxes is novel, an expansion of voting access, not a deprivation.

On the other hand, the Emergency Regulation's provision of ballot dropboxes is a uniform policy applicable to all counties, and under the second *Anderson-Burdick* element, the Commonwealth has a valid justification for requiring that ballot dropboxes be secured. Finally, under the balancing test of the third *Anderson-Burdick* element, it is clear that the Commonwealth's interest far outweighs any alleged injury claimed by the McGrath Campaign. A challenge to the Emergency Regulation's simple and reasonable requirements for ballot dropbox security – requirements that are fair and neutral – must be deemed a challenge to the dropboxes' very existence; but for the Emergency Regulation they would not be a feature of this election. Nor can the Court assume that the SBE, the Governor and the Secretary of State would have approved

dropboxes as an option for voters if, as the McGrath Campaign encourages, the dropboxes would not be subject to simple and reasonable security requirements. The Emergency Regulation does not burden—but actually expands—Kentuckians' ability to vote.

### B.  The McGrath Campaign Fails To Establish That The Emergency Regulation Violates The Equal Protection Clause.

Similarly, the McGrath Campaign fails to establish that the Emergency Regulation violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. According to the McGrath Campaign, each county's "different approaches" creates "inconsistencies" and "diverging standards across Counties and Defendants' Clerks' Offices" which are "denying many voters and McGrath Campaign supporters of equal protection under the law." (Intervening Complaint, ¶¶ 98-99).

However, under the *Anderson-Burdick* test, the McGrath Campaign fails to establish "the character and magnitude of the asserted injury protected by the [Constitution]." Indeed, nothing in the Emergency Regulation treats counties and its citizens differently with respect to absentee voting. On the other hand, the Emergency Regulation implements uniform policies applicable to all counties with respect to absentee voting. As stated previously, the Commonwealth has a valid justification for requiring the deadline to request an absentee ballot, and requiring that ballot dropboxes be secured.[23] Thus, when weighing the McGrath Campaign's nonexistent "injury" of the Emergency Regulation's uniform application to all counties against the Commonwealth's justification for imposing a deadline to request an absentee ballot, and imposing reasonable security requirements for ballot dropboxes, it is clear that the Commonwealth's interests far outweighs any alleged injury claimed by the McGrath Campaign. Thus, the McGrath Campaign

---

[23] Any voter seeking a "24-7" ballot dropbox may simply use a mailbox: all absentee ballots are postage prepaid.

has failed to demonstrate that the Emergency Regulation's directives violate the Equal Protection Clause in any way.

### C. The McGrath Campaign Fails To Establish That The Emergency Regulation Violates Procedural Due Process.

Finally, the McGrath Campaign fails to establish that the Emergency Regulation violates procedural due process. Specifically, the McGrath Campaign alleges that procedural due process was violated because the Emergency Regulation "only appl[ies], by [its] terms, to the June 23 election," but "the Regulation[] establish[es] that a public hearing . . . shall be held on July 31, 2020—over a month after the very Regulation[] being commented on will become moot." (Intervening Complaint, ¶ 92).

However, the Emergency Regulation does not violate procedural due process because its procedures comply with Kentucky law's due process requirements. An emergency administration regulation, which is a regulation that must be "placed into effect immediately in order to…protect human health and environment," "shall become effective and shall be considered as adopted upon filing." KRS 13A.190(1)(a), (2). Although an emergency regulation becomes effective immediately upon filing, the administrative body must still schedule a public hearing and public comment period pursuant to KRS 13A.270(1) if the emergency administrative regulation will not be replaced by an ordinary administrative regulation. *See* KRS 13A.190(8)(a).

The Emergency Regulation wholly complies with KRS 13A.190 and KRS 13A.270. The SBE, acting upon the recommendation of Secretary Adams accepted by Governor Beshear, promulgated the Emergency Regulation, which became immediately effective pursuant to KRS 13A.190(2). Thereafter, under KRS 13A.190(8)(a), the SBE scheduled a public hearing and public comment period pursuant to KRS 13A.270(1). The McGrath Campaign does not allege that the SBE violated KRS 13A.190 and KRS 13A.270 in promulgating the Emergency Regulation. On

the other hand, the McGrath Campaign merely finds dissatisfying that the public hearing will not be held until July 31, 2020. (Intervening Complaint, ¶ 92). However, mere dissatisfaction with the date of the public hearing is not a sufficient basis that establishes a procedural due process claim. Accordingly, the McGrath Campaign wholly fails to demonstrate that the Emergency Regulation violates procedural due process.

### III. The Injunctive Relief Sought by The McGrath Campaign Related to Absentee Ballots Is Prohibited By Kentucky Law.

Finally, even assuming that the McGrath Campaign has demonstrated standing and stated a claim upon which relief can be granted—which it has not—certain of the injunctive relief sought in the Intervening Complaint unrelated to the voting location and voting hours issues must be denied because it is prohibited by Kentucky law. Specifically, the McGrath Campaign requests the Court (1) extend the deadline to request absentee ballots to 11:59 a.m. EST on June 19; and (2) permit campaign staff and volunteers to complete ballot requests for voters over the phone "just as Clerks are permitted to do."[24]

This relief, however, is prohibited by Kentucky law. First, the McGrath Campaign's request to extend the deadline to request absentee ballots to June 19, 2020 is wholly contrary to KRS 117.085. Under KRS 117.085(1), a "qualified voter may apply to cast his or her vote by mail-in absentee ballot if the completed application is received *not later than the close of business hours seven (7) days before the election*."[25] The election will occur on June 23. Thus, the McGrath

---

[24] D.E. 18-3, Intervening Complaint, Prayer for Relief, at C. It is unclear what provision of the Emergency Regulation the McGrath Campaign challenges with respect to who may partake in the process of fulfilling absentee ballot requests.
[25] Due to the heightened demand for absentee ballots anticipated by the SBE, and the need for county clerks to promptly issue them in order for voters to timely receive and return them, the SBE, with the consent of the Governor and Secretary of State, set a slightly earlier absentee request deadline than the one established by statute for non-emergency situations.

Campaign's request to extend the absentee ballot request deadline to June 19—three days before the election—is directly contrary to, and wholly impermissible under, KRS 117.085(1).

Second, under KRS 117.085(1), "[a]ll requests for an application for a mail-in absentee ballot may be transmitted by telephone, facsimile machine, by mail, by electronic mail, or in person. The county clerk shall transmit all applications for a mail-in absentee ballot to the voter by mail, electronic mail, or in person at the option of the voter, except as provided in paragraph (b) of this subsection." Thus, under KRS 117.085(1), only the county clerk may take requests for an application for a mail-in absentee ballot, then transmit all applications to the voter. Accordingly, the McGrath Campaign's request that the Court require that "Defendants permit campaigns, volunteers, or other civic organizations to complete ballot requests for voters over the phone, just as Clerks are permitted to do" is directly contrary to, and wholly impermissible under KRS 117.085(1). Little wonder: one can hardly imagine a greater conflict of interest than for a political campaign to perform what the General Assembly has decided should be a governmental function, of ensuring ballots are requested by legitimate voters, and that all such requests are fulfilled. Will the McGrath Campaign next sue for establishment of thousands of new polling sites across the Commonwealth, to be operated by McGrath Campaign workers? In any event, the McGrath Campaign has not challenged the statute that underlies this provision of this aspect of the Emergency Regulation, and cannot challenge this aspect because it simply complies with a sensible law whose constitutionality the McGrath Campaign does not challenge.

Accordingly, this Court must deny the injunctive relief sought by the McGrath Campaign with respect to the deadline to request absentee ballots and permitting campaign staff and workers to complete absentee ballot requests as such relief is prohibited by Kentucky law.

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss the McGrath Campaign's Intervening

Complaint [D.E. 18-3].

Respectfully submitted,

*/s/ Michael R. Wilson*
Michael R. Wilson (michael.wilson@ky.gov)
Office of the Secretary of State
700 Capital Avenue, Suite 152
Frankfort, KY 40601
(502) 782-7439
*Counsel for Michael Adams, in his official capacity*
*as Kentucky Secretary of State*

## **CERTIFICATE OF SERVICE**

It is hereby certified by undersigned counsel that the foregoing was filed through the federal Case Management Electronic Case Filing system (CM/ECF) this 16th day of June, 2020 to all counsel of record.

*/s/ Michael R. Wilson*
Michael R. Wilson