## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

Hon. JASON NEMES, et al.                                      **PLAINTIFFS**


vs.                                      **CIVIL ACTION NO. 3:20-CV-407-CRS**


CARL BENSINGER, et al                                      **DEFENDANTS**


## <u>MEMORANDUM OPINION</u>

This matter is before the Court on Plaintiffs Hon. Jason Nemes, James Howland, Ken Kearns, Aaron Gillum, Theodore Roberts, Tyson Hermes, Erik Hermes, and Keisha Dorsey's Emergency Motion for Restraining Order and/or Preliminary Injunction. DN 4. Defendants, Albert Chandler III, Sherry Whitehouse, George Russel, Katrina Fitzgerald, Deanna Brangers, Cory Skolnick, Dwight Sears, and James Lewis, in their official capacities as members of the Kentucky State Board of Elections; and Carl Bensinger, Bobby Holsclaw, John Aubrey, Linda Huber, Don Blevins, Kathy Witt, Marilyn Dishman, Daniel Miller, Gabrielle Summe, Chuck Korzenborn, Richard Scott Kimmich, and Sarah Rogers, in their official capacities as the respective members of the Jefferson, Fayette, and Kenton County Boards of Elections filed responses. DN 33; DN 38.

This matter is now ripe for adjudication.

The issue before this Court is not whether a hypothetical voter in Kentucky's upcoming primary election would benefit from additional polling locations. Rather, the issue is whether the challenged election procedures result in a cognizable infringement under the Constitution or an injury under the Voting Rights Act. We conclude that it does not. For the following reasons, it is

1

apparent that Plaintiffs have not shown a likelihood of success on the merits and  Plaintiffs'
motions for injunctive relief will be denied.

## I.  Factual Background and Procedural History

This case arises from a challenge to the voting procedures for the upcoming Kentucky
primary election. On March 6, 2020, Kentucky Governor Andrew Beshear declared a State of
Emergency for the Commonwealth due to the global COVID-19 pandemic. Exec. Order 2020-215
(Mar. 6, 2020). The pandemic continues to affect all aspects of everyday life in the United States.
On March 16, 2020, the Governor, by Executive Order and at the recommendation of Secretary of
State Michael Adams, delayed the primary election originally scheduled for May 19, 2020, until
June 23, 2020 ("Election Day"). Exec. Order 2020-236 (Mar. 16, 2020).

On April 23, 2020, the Secretary issued a letter to the Governor recommending the
Governor implement certain procedures for the upcoming primary election. DN 1 at ¶ 46; *See*
Letter from Secretary of State Adams to Governor Beshear (April 23, 2020)
(https://governor.ky.gov/attachments/20200423_Ltr-from-Sec-of-State-Adams.pdf). Specifically,
the Secretary recommended procedures relating to absentee voting, early in-person voting, and
polling locations for in-person voting on Election Day. *Id.* For absentee voting by mail, the
Secretary recommended the following relevant procedures: (1) the Board of elections promulgate
emergency regulations that relax the requirements for voters to obtain an absentee ballot, *id.* ¶ 2–
4, (2) the Board of Elections send a "non-forwarding postcard to each registered voter notifying
same of the ability, and the process, to vote absentee in the June 23, 2020 elections," and "establish
a secure online portal for the request of an absentee ballot by a registered voter" *id.* at ¶ 11–12, (3)
"absentee ballot[s] postmarked on or before June 23, 2020 may be accepted until 6:00 p.m., local

time, [until] June 26, 2020," and "[t]he counting of ballots must be completed by June 30, 2020." *Id.* at ¶ 14, 17.

Regarding in-person voting on or before Election Day, the Secretary recommended the following relevant procedures: (1) the Board of Elections "shall empower all county clerks to conduct in-person absentee voting on June 8–13, 2020, June 15–20, 2020, and June 22, 2020," and that "[i]n the conduct of in-person absentee voting, appropriate precautions shall be taken consistent with Centers for Disease Control guidance, and the State Board of Elections shall provide materials to assist in proper sanitization," *id.* at ¶ 5; and (2) the Board of elections "shall empower all county clerks to reduce the number of sites for in-person voting on June 23, 2020" and "[i]n the conduct of in-person voting, appropriate precautions shall be taken consistent with Centers for Disease Control guidance, and the State Board of Elections shall provide materials to assist in proper sanitization," *id.* at ¶ 6.

In response to the Secretary's letter, on April 24, 2020, the Governor issued an Executive Order directing the State Board of Elections to promulgate emergency regulations pertaining to the execution of the primary election. DN 1 at ¶ 46; Exec. Order 2020-296 (Apr. 24, 2020). In this Executive Order, the Governor declared "[a]ll Kentuckians should utilize absentee voting by mail for the June 23, 2020 primary election if they are able to do so." Exec. Order 2020-296 (Apr. 24, 2020) at ¶ 1. The Governor further ordered the Board of Elections to "promulgate emergency regulations to provide [] expanded absentee voting by mail" and "take all reasonable steps to ensure the safety of county clerks and poll workers when direct voting (not by mail) is necessary." *Id*. at ¶ 2–3. Specifically, the Governor ordered that the Board of Elections take the following steps to ensure the safety of county clerks and poll workers during in-person voting: (1) permit early in-person voting to begin June 8, 2020 and directing clerks to prioritize such voters by appointment,

3

(2) provide personal protective equipment (PPE) and materials to assist in proper sanitization to clerks and poll workers, and (3) instruct county clerks to implement procedures that limit direct contact between individuals, whether poll workers or voters. *Id.* at ¶ 3 a–d.

On May 1, 2020, the Board of Elections issued emergency regulation 31 KAR 4:190E. *See* 31 KY. ADMIN. REGS. 4:190E (2020); DN 1 at ¶ 46. In promulgating this regulation, the Board of Elections stated "[t]his emergency regulation will allow the Commonwealth to conduct primary, special, and local opinion elections on June 23, 2020 in a manner that reduces the amount of exposure to voters, poll workers and administrators have to possible infection, thereby helping state and federal efforts to slow and stop the spread of the novel coronavirus." 31 KY. ADMIN. REGS. 4:190E (2020) at 1. The Board, in accordance with this purpose, issued the following relevant regulations with regard to absentee voting by mail and early in-person voting:

- [A]n application for an absentee ballot due to medical emergency a) shall not require the applicant to state that the emergency condition occurred within 14 days of the election, b) need not be notarized, and c) shall entitle the applicant, upon verification of the application, to vote by absentee, by mail or in person by appointment, as advised, if otherwise a lawful voter. *Id.* at Section 3;
- The State Board of Elections shall send a non-forwarding postcard to every registered voter of the Commonwealth to inform them of the changes being made to the June 23, 2020 election as a result of the COVID-19 pandemic, as well as the steps the voter must take to request an absentee ballot through the SBE secure online portal or by calling their County Clerk. *Id.* at Section 4;
- The State Board of elections shall establish a secure online portal that will allow voters to request an absentee ballot through the submission of personally identifiable information. *Id.* at Section 5;
- A voter shall request a mailed absentee ballot from the County Clerk of that voter's residence by 11:59 p.m. EST June 15, 2020. All mail-in ballots shall have the return postage paid for by the State Board of elections…absentee ballots delivered by the United States Postal Service and bearing a postmark of June 23, 2020 or an earlier date, shall be counted if received by 6:00 p.m., June 27, 2020. *Id.* at Section 6;
- All County Clerks shall make their offices and telephone lines available for the purpose of allowing registered voters of their respective counites to schedule appointments to vote absentee by appointment beginning no later

4

> than June 8, 2020 and ending June 22, 2020, no fewer than 5 days per week in the two weeks before the week of election day. *Id.* at Section 10.

In addition to these regulations, the State Board of Elections required each County Board of Elections submit a proposal regarding its absentee ballot processing and counting, and its plan to reduce in-person polling places on Election Day:

- On or before June 1, 2020, each County Board of Elections shall appoint an absentee ballot processing committee with a minimum of four (4) members, all of whom must be registered voters in that county….Each County Board of Elections shall establish, and present to the State Board of Elections for approval, a process for observation of absentee ballot processing and counting, to be conducted in a manner consistent with Centers for Disease Control guidance. *Id.* at Section 8;
- Notwithstanding any statute or regulation to the contrary, County Clerks are directed to reduce the number of sites for in-person voting for June 23, 2020, with such reduction and such sites to be pre-approved by the State Board of Elections. *Id.* at Section 11.

Consistent with this mandate, the County Clerks of Jefferson, Fayette, and Kenton counties each submitted plans developed by their County Board of Elections to the State Board of Elections. DN 38 at 5.

On May 19, 2020, the Jefferson County Board of Elections "met…and approved two polling locations to cast ballots for the June 23, 2020 primary with one location, the Kentucky Exposition Center, for in-person voting on election day." DN 38-2 at ¶16. Jefferson County has approximately 615,511 registered voters. DN 1 at 30. Voters are able to cast in-person absentee ballots at the Edison Center, located at 701 W. Ormsby Avenue, Louisville, KY 40203, prior to Election Day between June 8 and June 22. *Id.* at ¶ 17. According to the declaration of Maryellen Allen, the Co-Director of the Jefferson County Election Center, the Kentucky Exposition Center and the Edison Center "follow COVID-19 guidelines established by the Commonwealth of Kentucky, which includes distancing, requesting voters wear masks, requiring election workers to wear masks, providing disposable pens to cast ballots and cleaning voting booths regularly during

the day." *Id.* at ¶ 19. Specifically, the Kentucky Exposition Center has "over 1,300,00 square feet of indoor space and over 19,000 parking spaces. *Id.* at ¶ 20. And, further, "based on six-foot separation 1,140 voters may safely distance while in line" at the Kentucky Exposition Center. *Id.* at ¶ 62. The Exposition Center will have check-in tables for the eighteen legislative districts in Jefferson County and "350 voting booths" and "70 Express Booths" ("a video touch terminal with earphones used primarily for voters with disabilities" *Id.* at ¶ 57) "all properly distanced." *Id.* at ¶ 62.

On May 21, 2020, the Fayette County Board of Elections "discuss[ed] the upcoming election and determine[d] a plan for in-person voting to include two in-person polling locations on election day for Fayette County in coordination with State Board of Elections and the Emergency Regulations [31 KY. ADMIN. REGS. 4:190E (2020)]." DN 38-7 at ¶ 7. Fayette County has 243,739 registered voters. *Id.* at ¶3. According to the declaration of Don Blevins, Jr., Fayette County Clerk and Chairman of the Fayette County Board of Elections, voters are able to cast in-person absentee ballots between June 8 and Election Day "at the Lexington Senior Center (195 Life Lane, 40502) by appointment only." *Id.* at ¶ 11. In-person voting on election day will "take place from 6 am to 6 pm at Kroger Field inside the Central Bank Field Club." *Id.* at 14. Voters will also be able to drop off their absentee ballot into a "secure drop box form June 15–22…at the President's Pavilion outside of Gate 9 at Kroger Field at the University of Kentucky." *Id.* at ¶12(b). Blevins also states that "Kroger Field was selected as a location [] to allow for social distancing (at least six feet apart)." *Id.* at ¶ 15. "[L]ines will be clearly identified with chalk marks demonstrating a distance of six feet from the closet voter, which will be enforced by poll workers who will be patrolling the line." *Id.* Further, "[e]lection workers will be wearing appropriate Personal Protective Equipment." *Id.* at ¶ 16.

Kenton County has approximately 137,000 registered voters. DN 38-8 at ¶ 4. According to the declaration of Gabrielle Summe, Kenton County Clerk, early in-person voting will take place between June 8 and June 22, from 7:30 a.m. to 4:00 p.m., at the County Administration Building, located at 1840 Simon Kenton Way, Covington, KY. DN 39-8 at 1–2. In-person voting on Election Day will take place at the Northern Kentucky Convention Center. DN 38-8 at ¶ 5. The Convention Center's size will allow for social distancing, and accommodate the County Clerk's staff and 100 volunteers. *Id.* at ¶ 6. The Convention Center will also accommodate "30 sufficiently spaced voter check-in spots" and "a bank of voting machines spaced apart for privacy while maintaining social distancing." *Id.*

Collectively, the County Board of Election Defendants assert the following justifications for choosing a single polling location for in-person voting on Election Day: (1) each county "had a difficulty finding a sufficient number of poll workers to staff multiple polling places" because many of poll workers "are in the age group that is particularly susceptible to COVID-19, and therefore did not want to work the polls this year," (2) "it was impracticable to prepare multiple [polling] places to train the requisite number of poll workers, and to acquire the necessary amount of personal protective equipment for a large number of poll workers in [a] short amount of time," (3) traditionally utilized polling locations were closed due to the COVID-19 pandemic, and (4) Kenton County's voter check-in software prevented the County Clerk from "track[ing] whether a voter who came to vote at one location had already voted in-person at another location. DN 38 at 6–7. The County Board of Election Defendants also assert that each of the Election Day in-person polling locations "allow for COVID-19 precautions" including proper social distancing and one-way access through each location. *Id.* at 8. Finally, the County Board of Election Defendants assert that each polling location is "centrally located within its respective county; is located on a bus

route to allow for access by those who must use public transportation to vote; and has ample, free parking to allow for access by those who will drive to the polling place," and is handicap accessible. *Id.*

On June 3, 2020, the Kentucky Board of Elections held a meeting to discuss the plans submitted by each county. DN 1 at ¶ 79. Ultimately, the Board approved plans from Jefferson, Fayette, and Kenton counties that provided one polling precinct for in-person voting on Election Day.[1] *Id.* at ¶ 86.

The decision and eventual approval of Defendants' plans to have a single polling location led to the claims before the Court. Plaintiffs, Hon. Jason Nemes, James Howland, Ken Kearns, Aaron Gillum, Theodore Roberts, Tyson Hermes, Erik Hermes, and intervening Plaintiff Keisha Dorsey (collectively the "Plaintiffs") have brought suit against the County Clerks, County Sheriffs, and County Board of Election members of Jefferson, Fayette, and Kenton counties, and the Members of the State Board of Elections.[2] DN 1. Plaintiffs bring two claims: (1) violation of the First and Fourteenth Amendment's fundamental right to vote under 42 U.S.C. § 1983 against all Defendants, and (2) violation of Section 2 of the Voting Rights Act 52 U.S.C. § 10301 "in relation to the single precinct in Fayette and Jefferson counties." DN 1 at ¶ 95–112. At bottom, Plaintiffs challenge the constitutionality of Jefferson, Fayette, and Kenton counties' plans to use a single polling location on election day. *Id.* Plaintiffs seek "declaratory relief, and prospective injunctive relief…declaring the challenged single polling precinct, at least in Kentucky's most populous

---

[1] Plaintiffs originally included the County Clerks, County Sheriffs, and County Board of Election members for Boone and Campbell counties in their complaint. DN 1 at ¶ 31–32. The parties have agreed to dismiss Boone and Campbell counties from the case. DN 31. Based on the agreed order, Boone and Campbell counties will now operate two polling locations on Election Day. *Id.* As of the writing of this memorandum opinion, Jefferson, Fayette, and Kenton counties remain in the case.
[2] Plaintiffs originally brought this suit against Secretary of State Adams and Governor Beshear. DN 1. The parties have since agreed to dismiss both the Secretary and the Governor from the case. DN 42; DN 44; DN 45.

counties, in contravention of the First and Fourteenth Amendments of the United States Constitution." *Id*. at ¶ 113.

Plaintiffs put forth evidence related to three distinct populations of voters in Jefferson, Fayette, and Kenton counties: (1) Black voters, (2) older voters, and (3) voters with disabilities. DN 1 at ¶ 56, 66, 69. Plaintiffs claim that "the health risks of in-person voting," during the COVID-19 pandemic, "are especially severe" for each group. *Id*. at ¶ 55. For Black voters, Plaintiffs assert five factual allegations. First, Plaintiffs allege, generally, that "Black Americans are less likely to own cars than any other demographic of Americans and they 'represent about one-quarter of all public transit users.'" *Id.* at ¶ 57. Further, Plaintiffs allege that "Black people with low income more often face "'driver's license suspensions…which similarly leaves them 'dependent on friends, or public transportation, unable to practice the social distancing recommended by the CDC.'" *Id.* Therefore, Plaintiffs conclude that Black voters "face additional risks of contact with exposed individuals in close quarters on public transportation when *en route* to their polling places." *Id.* Second, Plaintiffs assert that "Black voters are disproportionately burdened by long lines at the polls." *Id.* at ¶ 58. Third, Plaintiffs assert that, since "Black Americans have disproportionately high rates" of underlying medical conditions that exacerbate COVID-19, "Black voters…are more likely to suffer serious even deadly consequences" if they contract the virus while voting in-person. *Id.* at ¶ 59. Fourth, Plaintiffs assert that, "if Black voters contract the virus while voting in person they are also more likely to suffer serious consequences because of the inequalities in our health care system." *Id.* at ¶ 63. Fifth, Plaintiffs assert that "if Black voters contract the virus while voting in-person, they also face increased risk of spreading the virus to their loved ones and community." *Id.* at ¶ 64.

Plaintiffs provide the Court with COVID-19 infection and death rates of Fayette and Jefferson counties' Black population: (1) "Black people comprised roughly 30% of [Fayette] county's more than 188 coronavirus patients, though only 15% of the county's population is Black, and (2) "'Black people made up 23.5% of [Louisville]'s population in 2019...'but constituted 42 percent of the deaths from the [coronavirus]." *Id.* at ¶ 65. Ultimately, Plaintiffs argue that these factual allegations, evaluated together, support their claim that the single polling place in Jefferson, Fayette, and Kenton counties violates the Equal Protection clause of the Fourteenth Amendment, and "will have the effect of suppressing African American voters in violation of Section 2 of the Voting Rights Act." *Id.* at ¶ 96, 110.

For older voters, Plaintiffs assert that voters 65 years and older "are at higher risk for severe illness and death from COVID-19." *Id.* at ¶ 66. Due to this higher risk, Plaintiffs claim that single polling locations "will subject older voters and poll workers to a serious risk of infection at their polling places–and, with it, a greater risk of illness." *Id.* at ¶ 68. Therefore, Plaintiffs contend that this greater risk supports their claim that the single polling place in Jefferson, Fayette, and Kenton counties is unconstitutional. *Id.* at ¶ 96.

Plaintiffs assert that "voters with certain disabilities face an unreasonable risk of contracting COVID-19 at the polls or on their way to polling locations." *Id.* at ¶ 70. Plaintiffs support this assertion by claiming: (1) "many voters with disabilities are unable to drive to the polls and will therefore need to share transportation," (2) "many people with disabilities cannot mark paper ballots without assistance, so they rely on special voting machines…which could carry the COVID-19 virus from previous users and poll workers," and (3) certain disabilities, including blindness, make social distancing practices "more difficult." *Id.* These difficulties, according to Plaintiffs, will "needlessly increase the risk of transmission [of COVID-19]: larger crowds will

result in exposure to more people, and longer lines will result in prolonged exposure, both of which place voters with certain disabilities at increased risk of contracting the virus." *Id.* at ¶ 72. Plaintiffs contend that this greater risk and the alleged delay for in-person voting support their claim that the single polling place in Jefferson, Fayette, and Kenton counties is unconstitutional. *Id.* at ¶ 69.

Plaintiffs also assert there are "general burdens" which will affect all voters in Jefferson, Fayette, and Kenton counties who decide to vote in person on Election Day. Plaintiffs claim that "the congregation of tens of thousands or hundreds of thousands of voters at a single polling location in Jefferson, Fayette, Kenton [] and other counties makes it difficult, if not impossible, to facilitate" implementing Centers for Disease Control guidelines for voting and thereby "burdens the fundamental right to vote." *Id.* at ¶ 73–76. Therefore, Plaintiffs contend that this burden supports their claim that the single polling place in Jefferson, Fayette, and Kenton counties is unconstitutional. *Id.* at ¶ 69.

Further, Plaintiffs put forth expert analysis from Dr. Stephen Voss ("Voss"). If Jefferson, Fayette, and Kenton counties utilize one polling place on Election Day, Voss claims "[h]istorical voting registration and turnout statistics…demonstrate[] severe voters suppression particularly among minority, elderly, and economically disadvantage persons." DN 1 at ¶ 77. Voss bases this conclusion on two primary assertions. First, Voss claims that a "single, in-person polling station in each county will greatly increase the costs of voting and result in less political participation than would otherwise have taken place." DN 4-2 at ¶ 5(B). Voss states that this result is driven by the disruption to traditional voting practices and the additional "travel distance" to the polling location all Kentuckians, particularly those from urban areas, will allegedly experience on Election Day. *Id.* at ¶ 5(B)(i–ii). Second, Voss states that early in-person voting and absentee by mail voting "in general does not increase voter participation much compared to what states see from in-person

voting" and only "reinforces biases in the political system, rather than repairing the deficiencies of other options." *Id.* at ¶ 5(d)(i). Further, Voss states that Kentucky's current absentee vote by mail system will decrease participation from "resource-poor citizens" because they are "not accustomed to processing paperwork, and the act of casting a valid ballot can be especially challenging or alienating for them." *Id.* at ¶ 5(d)(ii).

At the time of the writing of this memorandum opinion, the primary election is five days away. Early in-person voting has begun in Jefferson, Fayette, and Kenton counties. DN 38-2 at ¶ 17–18; DN 38-7 at ¶ 11; DN 38-9 at 2. Jefferson County has received 202,652 requests for absentee ballots and has mailed 162,328 ballots to voters, allegedly 22,345 more than "ballots…cast in totality in the 2016 primary." DN 38-2 at ¶ 34–35. The Transit Authority of River City "is providing free rides to the Kentucky Exposition Center on June 23, 2020 for those who need transportation." *Id.* at ¶ 28; *Id.* at p. 8. Fayette County has received 92,611 applications for absentee ballots and has mailed 84,676 ballots to voters. DN 38-7 at ¶ 13. "This represents a potential voter turnout of 38%, far surpassing every Presidential Primary for over 20 years." *Id.* Lexington's bus service, LexTran, will be "providing free bus rides to anyone traveling during the COVID-19 emergency, including on Election Day." *Id.* at ¶ 14. While Kenton County has not provided any statistics regarding its current absentee ballot requests, it similarly asserts that free bus services will be provided to the Northern Kentucky Convention Center on Election Day. DN 38-8 at ¶ 5.

Plaintiffs ask the Court to order additional polling locations be open for in-person voting on Election Day. DN 27-6. Specifically, Plaintiffs request sixteen polling locations in Jefferson County, nine polling locations in Fayette County, and two in Kenton County. *Id.* Further, Plaintiffs have provided the declaration of James Young, former Director of Elections for Jefferson County, in which he states that adding polling locations in each county should be "easily implemented."

DN 27-1 at ¶ 27. If the Court determines that remedial intervention necessary, Plaintiffs have also provided assurances that Jefferson County Public Schools is committed to open schools for additional polling places on Election Day and that Plaintiffs Jason Nemes and Keisha Dorsey, in conjunction with the Jefferson County Teachers Association, have "obtained additional poll workers to work this election." DN 27 at 4.

Plaintiffs filed this suit on June 8, 2020. DN 1. They filed the instant motion for a temporary restraining order and a preliminary injunction on June 10, 2020. DN 4. After recusals by three other judges of this Court, and subsequent assignment of this case to the undersigned, an evidentiary hearing was scheduled by agreement for June 17. DN 22. Defendants filed their responses on June 16. DN 33; DN 37. Later that same day, the parties advised the Court that the evidentiary hearing was unnecessary, and the Court remanded the hearing. DN 48. Accordingly, by agreement, the Court took the matter under submission on the briefs and exhibits filed in the record. *Id.*

## II. Legal Framework
### A. Standing

As explained in *League of Women Voters of Michigan v. Johnson*, 352 F. Supp. 3d 777, 792 (E.D. Mich. 2018), *rev'd and remanded,* No. 18-2383, 2018 WL 10096237 (6th Cir. Dec. 20, 2018), "Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,' and 'Article III standing...enforces the Constitution's case-or-controversy requirement.'" *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597–98 (2007) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). "In essence, the standing doctrine prompts courts to inquire 'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to

justify exercise of the court's remedial powers on his behalf.'" *McKay v. Federspiel*, 823 F.3d 862, 866–67 (6th Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

   Plaintiffs' standing must be established as a threshold matter. *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017). "To establish standing…a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)." *Thole v. U. S. Bank N.A*, No. 17-1712, 2020 WL 2814294, at *2 (U.S. June 1, 2020).

   The Supreme Court noted that it had "long recognized that a person's right to vote is 'individual and personal in nature.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) ). Accordingly, individuals must show "disadvantage to themselves as individuals" to establish standing. *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

   We find that Plaintiffs have articulated an injury-in-fact; that is, they claim a substantial risk that they will be harmed when the Kentucky primary election takes place and voters in Jefferson, Fayette, and Kenton counties are afforded only one polling place.

### B.  Injunctive Relief

   The matter is presently before us on a motion for preliminary injunctive relief.

   The Court considers four factors in determining whether to issue a temporary restraining order or preliminary injunction: (1) Whether the movant has demonstrated a strong likelihood of success on the merits; (2) Whether the movant would suffer irreparable harm without the injunction; (3) Whether issuance of an injunction would cause substantial harm to others; and (4) Whether the public interest would be served by issuance of the injunction. *Suster v. Marshall*, 149

F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

We address these factors in turn.

### III. Analysis

We start from the immutable premise that the right of citizens to effectively cast their vote "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986). The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986)." *Burdick,* 504 U.S. at 433. So too, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). To that end, states "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997); *see also Storer v. Brown,* 415 U.S. 724, 730 (1974).

In this action,  Plaintiffs seek an injunction that would upend the current election plans and substitute a plan of their own design. They seek the Court's intervention to change plans which, for better or worse, were put in place in a considered effort to address the unprecedented challenge of conducting a free and fair election in the midst of a deadly pandemic. *See* Exec. Order 2020-296 (Ap. 24, 2020); 31 KY. ADMIN. REGS. 4:190E (2020). While we are duty-bound to protect our precious constitutional freedoms, "[t]he federal courts should not quickly 'become entangled, as overseers and micromanagers in the minutiae of state election processes.'" *Ohio Dem. Party v. Husted*, 834 F.2d 620, 622 (6th Cir. 2016).

Mandatory injunctions are disfavored, and for good reason. *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 236 (4th Cir. 2014). "Mandatory injunctions alter the status quo, [whereas] prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *Id.* In light of the ongoing global health crisis, no party in this case has advocated a return to the pre-pandemic voting procedures for Kentucky's 2020 primary election. The status quo was altered on March 6, 2020 with the declaration of a state of emergency in the Commonwealth due to COVID-19. Exec. Order 2020-215 (Mar. 6, 2020). Americans have been living in a state of uncertainty since that time, as epidemiologists and government officials seek to find the "sweet spot" where restoration to ordered life and the protection of human health can meet effectively.

The Kentucky primary was postponed from May 19, 2020 to June 23, 2020. Delay of the election did not solve the Commonwealth's problems. Continuing concerns over controlling infection rates and maintaining social distancing as the pandemic persists led to the request by Secretary of State Michael Adams that Governor Andrew Beshear order that emergency

regulations be promulgated, and that CDC guidelines be utilized in conjunction with voting plans for the June 23, 2020 election. *See* Adams Ap. 23, 2020 letter to Beshear.

Governor Beshear's Order of April 24, 2020 states "All Kentuckians should utilize absentee voting by mail for the June 23, 2020 primary election if they are able to do so." The Order further directs that emergency regulations be promulgated to facilitate expanded absentee voting, permit in-person voting beginning June 8, 2020, and directs that the Board of Elections take reasonable steps to ensure the safety of poll workers and implement procedures to limit direct contact between individuals, whether poll workers or voters. *See* Exec.Order No. 2020-296 (Ap. 24, 2020).  In accordance with these directives, comprehensive plans were put in place which included absentee mail-in ballots available to all voters who wanted them, early in-person voting options for 15 days leading up to Election Day, and, in Jefferson, Fayette, and Kenton counties particularly, establishment of a single polling location which  Defendants indicate "is centrally located within its respective county; is located on a bus route to allow for access by those who must use public transportation to vote; and has ample, free parking to allow for access by those who will drive to the polling place," DN 38 at 8.

"As a general rule, last-minute injunctions changing election procedures are strongly disfavored. *Purcell v. Gonzalez,* 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) ("Court orders affecting elections ... can themselves result in voter confusion.... As an election draws closer, that risk will increase."); *Ne. Coal. for the Homeless v. Blackwell,* 467 F.3d 999, 1012 (6th Cir. 2006) ("[T]here is a strong public interest in smooth and effective administration of the voting laws that militates against changing the rules in the middle of submission of absentee ballots."); *Summit Cnty.,* 388 F.3d at 551 ("It is particularly harmful to such interests to have the rules changed at the last minute.")." *Serv. Employees Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012).

However, "Federal judicial remedies, of course, are necessary where a state law impermissibly infringes the fundamental right to vote." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623 (6th Cir. 2016).

We are presently mere days away from Election Day. This lawsuit first came before this judge just one week ago. Plaintiffs have offered evidence via affidavits that they presently have additional individuals available and willing to volunteer as additional poll workers and that they have obtained commitments from Jefferson County Public Schools to open their facilities to serve as additional polling places, should the Court order it. Further, James Young, former Director of Elections for Jefferson County, has stated that transitioning from one to a number of polling places in each of Jefferson, Fayette, and Kenton counties would be "easily implemented." DN 27-1 (Young Aff.).

While it may seem intuitive that, when it comes to polling places, more is better, that is not a call for this Court to make, *unless* we first find a constitutional or statutory violation. When an election regulation or procedure is unconstitutional, but time until the election is exceedingly short, a determination must be made under the "*Purcell* Principle" whether intervention would result in chaos and uncertainty, and thus impair public confidence in the election process. *Purcell*, 549 U.S. 1, 5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."). But we need not engage in the proposed prognostication, and indeed we are prohibited by law from doing so, as we find that no constitutional violation has been shown under either a First and Fourteenth Amendment or a Voting Rights Act analysis.

## A. Likelihood of Success on the Merits

**1**. **First and Fourteenth Amendment Challenge (42 U.S.C. § 1983)**

Plaintiffs contend that their First Amendment right to freedom of speech, expression and association and their Fourteenth Amendment right to equal protection of the laws will be infringed by the availability of only one polling place in their respective counties for the casting of an in-person vote on Election Day.

The right to vote is "protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *See*, *Bush v. Gore*, 531 U.S. 104 (2000). The Equal Protection Clause comes into play when a state either classifies voters in disparate ways or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012). Election cases such as the one before us "rest at the intersection of two competing interests" – the special protection afforded the right to vote and the state's authority to regulate the right to vote. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626–32 (6th Cir. 2016)(*citing Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 670 (1966) (the right to vote is afforded special protection by the courts); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203–04 (2008) (Stevens, J., op.) (recognizing that neutral, nondiscriminatory regulation will not be lightly struck down, despite partisan motivations in some lawmakers, so as to avoid frustrating the intent of the people's elected representatives)).

A constitutional challenge to an election regulation or procedure requires that the Court balance the competing interests under the so-called *Anderson-Burdick* framework, an analysis rooted in the Supreme Court cases of *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* framework requires that the court "first consider the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate. Second, it must identify and evaluate the precise

interests put forward by the State as justifications for the burden imposed by its rule. Finally, it must determine the legitimacy and strength of each of those interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015) (internal quotation marks and citations omitted).

The Supreme Court noted in *Burdick* that the "rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. If "severe restrictions" are imposed on the plaintiff's right to vote, the regulation is subjected to strict scrutiny and will survive only if "narrowly drawn to advance a state interest of compelling importance." *Id*. At the other end of the continuum, "minimally burdensome and nondiscriminatory" regulations are put to a "less-searching examination closer to rational basis" and "the State's important regulatory interests are generally sufficient to justify the restrictions." *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citing *Hargett*, 767 F.3d at 546, and quoting *Burdick*, 504 U.S. at 434). The Court must apply a "flexible analysis" to regulations which are somewhere in between the two extremes on the *Anderson-Burdick* continuum. The Court in such an instance "weigh[s] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Hargett*, 767 F.3d at 546.

If a State has enacted a "generally applicable, nondiscriminatory voting regulation…its 'important regulatory interests' would likely be sufficient to justify the restriction." *Obama for America*, 697 F.3d at 433–34 (quoting *Burdick*, 504 U.S. at 434); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452 (2008) ("If a statute imposes only *modest* burdens, however, then the State's important regulatory interests are generally

sufficient to justify reasonable, nondiscriminatory restrictions on election procedures." (internal quotation marks omitted; emphasis added)).

Plaintiffs contend that the provision of only a single polling place impermissibly burdens the exercise of the right to vote, particularly for Black, elderly, and disabled voters.  Plaintiffs focus on factors such as distance to the polling place, associated costs, logistical difficulties, a probability of long lines, and anticipated difficulty in social distancing at the polls. The magnitude of any burden thus caused must be determined with reference to the totality of the circumstances.

Comprehensive plans were put in place which included making absentee ballots available for all voters, providing early in-person voting options for 15 days leading up to Election Day, and establishing a polling place for Election Day in-person voting. This Triple Crown of voting options wins against the pandemic's risk of disenfranchising the Kentucky voter. Absentee mail-in balloting is an option to prevent disenfranchisement of the voter who fears exposure to COVID-19 at a polling place and chooses to avoid the risk by remaining at home. Early in-person voting addresses the possibility of disenfranchisement of the voter who, despite overriding concerns about exposure to the virus at the single polling place on Election Day, needs or desires to vote in person. In-person voting on Election Day remains available for voters who, despite concerns about exposure, wish to cast their vote in person on Election Day.

We find that the contraction of the number of polling places from many to one in three of Kentucky's most populous counties imposes no more than a modest burden on the right to vote inasmuch as voters were afforded the unrestricted opportunity to vote by absentee mail-in ballot, and the ability to vote early in person for a significant period of time in advance of Election Day. *See Ohio Dem Party*, 834 F.3d at 628 (S.B. 238, as one component of Ohio's abundant voting alternatives, characterized as a withdrawal or contraction of just one of many conveniences and at

most, imposing a modest burden). In *Ohio Democratic Party,* the Sixth Circuit stated, with respect

to Ohio's legislation reducing the period of early in-person voting and eliminating same-day

registration:

> To the extent S.B. 238 may be viewed as impacting such preferences, its "burden"
> clearly results more from a 'matter of choice rather than a state-created obstacle,'
> *Frank*, 768 F.3d at 749. The Equal Protection Clause, as applied under the
> *Anderson-Burdick* framework, simply cannot be reasonably understood as
> demanding recognition and accommodation of such variable personal preferences,
> even if the preferences are shown to be shared in higher numbers by members of
> certain identifiable segments of the voting public.

*Id.* at 630. To be clear, we fully acknowledge the bases for Plaintiffs' contention that the burden

falls more heavily on Black, elderly, and disabled voters. However, there is no disenfranchisement

which necessarily results from the imposition of this modest burden. In *Ohio Democratic Party*,

the Sixth Circuit found that, "viewing S.B. 238 objectively under the *Anderson-Burdick* framework

in a manner consonant with the Court's most recent application of the framework in *Crawford*, we

see a regulation that can only be characterized as minimally burdensome on the right of some

African-American voters. Beyond evidence that African Americans may use early in-person

voting at higher rates than other voters and may therefore be theoretically disadvantaged by

reduction of the early voting period, the record does not establish that S.B. 238—as opposed to

non-state-created circumstances—*actually makes voting harder* for African Americans." *Id.* at 631

(emphasis in original).

In *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), the United States

Supreme Court upheld an Indiana statute requiring government issued photo identification to vote

over a challenge that the statute was violative of the Fourteenth Amendment right to vote. In

finding that the requirement of the ID did not disenfranchise qualified voters who did not possess

the required identification and did not place an unjustified burden on those who could not readily

obtain an ID, the Court stated:

> For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting. Both evidence in the record and facts of which we may take judicial notice, however, indicate that a somewhat heavier burden may be placed on a limited number of persons. They include elderly persons born out of State, who may have difficulty obtaining a birth certificate; persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed. If we assume, as the evidence suggests, that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote. The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted. To do so, however, they must travel to the circuit court clerk's office within 10 days to execute the required affidavit. It is unlikely that such a requirement would pose a constitutional problem unless it is wholly unjustified. And even assuming that the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish petitioners' right to the relief they seek in this litigation.

*Crawford,* 553 U.S. at 198-99.

In *League of Women Voters of Florida v. Detzner*, 314 F.Supp.3d 1205 (N.D. Fla. 2018),

another district court grappled with the *Anderson-Burdick* test in the context of polling place

location, noted that

> At first blush, Plaintiffs' burdens appear slight. Indeed, some courts have characterized administrative burdens like waiting in line and commuting as not severe. In a challenge to Indiana's voter identification requirement, for example, the Supreme Court explained "[f]or most voters" the process of document-gathering, traveling to a state office, and obtaining a voter identification "surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198, 128 S.Ct. 1610 (controlling op.). Drawing from this language, a federal court recently described a group of plaintiffs' logistical burdens in early voting at the only allowable early voting site in the county as "nonsevere, nonsubstantial, or slight." *Common Cause Ind. v. Marion Cty. Election Bd.,* 2018 WL 1940300, at *12 (S.D. Ind. Apr. 25, 2018). And so courts have acknowledged there are differences

between "disparate inconveniences that voters face when voting to the denial or abridgement of the right to vote." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016). Voters are not entitled to have "every polling place ... be precisely located such that no group had to spend more time traveling to vote than did any other." *Id.* Conceivably, then, a college student having to travel to vote early would perhaps not face a substantial burden under *Anderson-Burdick* because of her commute.

But those are not the facts here. Florida's public college and university students are *categorically prohibited* from on-campus early voting because of Defendant's Opinion. This is not a "nonsevere, nonsubstantial, or slight burden." *Common Cause Ind.*, 2018 WL 1940300, at *12. This is not a mere inconvenience.

*Id.* at 1216. The case at bar does not involve a categorical prohibition, but instead some disparate inconveniences. Indeed, "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433.

Additionally, Justice Souter noted in his dissent that, after defining the character of the asserted injury under *Burdick,* the Court must also address its magnitude by answering the question "whether the number of individuals likely to be affected is significant as well." *Id.* at 1632. Plaintiffs have failed to adduce evidence particularized to Jefferson, Fayette, and Kenton voters with respect to the burden imposed by the single polling place. Further, the burden imposed by the single polling place impacts every voter who chooses to vote in person on Election Day in differing degrees, as nobody is voting in their own usual precinct due to the unprecedented circumstances of the pandemic. Thus, even if we had more than generalized historical data, the Court is unconvinced that extrapolation of that data to the present situation would yield any valid support for Plaintiffs' position. Defendants state that the number of absentee ballots that have been requested far exceeds the usual vote totals in a Kentucky primary. What this means for the turnout at the polls on June 23rd is anyone's guess. While Plaintiffs point to the problems faced in other recent state primaries as a dire prediction of long lines and health dangers here, other states' voting plans are not necessarily comparable to our own, as Defendants explain in their brief. In any event,

it is for Defendants, not the Court, to consider and implement the safest and most expedient method of conducting the election.

As in *Crawford* and *Ohio Democratic Party,* disenfranchisement does not necessarily result here. A panoply of options accommodates the decisions that must be made by each voter with respect to balancing considerations of voting preference and personal health concerns. We reiterate that there is no constitutional right to vote in a particular time, place or manner. Those determinations are left to the States. However, once a process is put in place, it must operate evenhandedly and not unconstitutionally burden the right to vote. The burden imposed by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19. We find the Commonwealth's legitimate interests "sufficiently weighty" to justify this modest burden. We thus conclude that provision of a single polling place in Jefferson, Fayette, and Kenton counties passes constitutional muster and the voting plans survive plaintiffs' First and Fourteenth Amendment challenge.

## 2. Voting Rights Act

"Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of 'rid[ding] the country of racial discrimination in voting.'" *Chisom v. Roemer,* 501 U.S. 380, 403 (1991) (alteration in original) (quoting *South Carolina v. Katzenbach,* 383 U.S. 301, 315 (1966)). "The Act create[d] stringent new remedies for voting discrimination where it persists on a pervasive scale, and…strengthen[ed] existing remedies for pockets of voting discrimination

elsewhere in the country." *Katzenbach*, 383 U.S. at 308. When Section 2 of the Voting Rights Act was originally enacted in 1965, it stated:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

*Chisom*, 501 U.S. at 391 (citing 79 Stat. 437).

In *City of Mobile v. Bolden*, 446 U.S. 55, 60–61 (1980) (plurality), the Supreme Court held that the "coverage provided by § 2 was unquestionably coextensive with the coverage provided by the Fifteenth Amendment; the provision simply elaborated upon the Fifteenth Amendment." *Chisom,* 501 U.S. at 392. Following the Supreme Court's decision in *Mobile*, Congress amended the Voting Rights Act to make clear that intentional discrimination was not a prerequisite for a claim brought under the statute. *Ohio Democratic Party v. Husted,* 834 F.3d 620, 637 (6th Cir. 2016). As amended, Section 2(a) of the Voting Rights Act (VRA) prohibits a state from imposing a "voting qualification or prerequisite to voting or standard, practice, or procedure...in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.] 52 U.S.C. § 10301(a) (emphasis added). According to Section 2(b), a voting practice or procedure can "result in" such a denial or abridgement even if there is no proof of discriminatory intent:

> A violation of subsection (a) is established if…the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id*. at § 10301(b). In short, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986).

The VRA encompasses two "conceptually distinct" claims—vote dilution and vote denial. *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 352 (6th Cir. 2018). Because Plaintiffs argue Defendants' actions resulted in both vote dilution and vote denial, the Court will address both types of claims.

### a. Vote Dilution

"Vote dilution claims involve challenges to methods of electing representatives—like redistricting or at-large districts—as having the effect of diminishing minorities' voting strength." *Ohio State Conference of the NAACP v. Husted,* 768 F.3d 524, 554 (6th Cir. 2014), vacated on other grounds, 2014 WL 10384647 (6th Cir. 2014). Other than a single mention of "vote dilution" in their complaint, Plaintiffs provide no explanation or support as to how or why the alleged disproportionate impact of a single in-person polling place would "dilute" the influence of Black voters. In fact, Plaintiffs do not actually argue that Black votes will be diluted (as in some redistricting cases), but that Black voters will be denied the opportunity to vote altogether. Accordingly, the Court finds that Plaintiffs' allegations are more accurately understood in the context of "vote denial." *See Ohio State Conference*, 768 F.3d at 554 (finding that "any claim that is not a vote dilution claim" is a "vote denial claim").

### b. Vote Denial

The Sixth Circuit has developed a two-part test to evaluate vote denial claims. "First, we examine whether a voting practice resulted in an adverse disparate impact on protected class members opportunity to participate in the political process." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 353 (6th Cir. 2018) (internal quotation marks and citation omitted). "To satisfy this element of the test, it must be shown not only that there is some statistical discrepancy between minority groups and whites, but that the challenged practice also causally

contributes to the alleged discriminatory impact by affording protected group members less opportunity to participate in the political process." *Id*. Second, if the initial step is satisfied, the Court considers whether, given the totality of the circumstances, "the challenged voting practice causes the discriminatory impact as it interacts with social and historical conditions." *Ohio Democratic Party,* 834 F.3d at 638.

In *Ohio Democratic Party v. Husted*, the Sixth Circuit overturned the District Court's finding of a Section 2 violation because:

> The district court paid little attention to the disparate impact element of the first step, referring simply to its prior *Anderson-Burdick* analysis to conclude that S.B. 238 "imposes a burden on the rights of African Americans to vote" and assuming that conclusion was sufficient to establish that S.B. 238 disparately impacted African Americans in a manner cognizable under Section 2…. But this hasty conclusion neglected the first step of our inquiry: whether S.B. 238 actually disparately impacts African Americans by resulting in "less opportunity [for African Americans] than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b).

*Id.* at 639. Although this Court's foregoing analysis of Plaintiffs' Constitutional claims demonstrates that a single polling location may modestly "burden" voters who choose to vote in person, this alone does not fulfill step one of the Court's Section 2 analysis. Plaintiffs must demonstrate that the voting plans in Jefferson and Fayette Counties result in "less opportunity [for African Americans] than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b). Plaintiffs have failed to do so.

Plaintiffs allege "a single polling location in Kentucky's most highly populated counties will disproportionately burden Black voters, who face heightened risks from contracting COVID-19 because of disparities in health and health care that raise the stakes for them at every step of the process." DN 1 at 17, ¶ 56. Plaintiffs' argument is without merit because, at each "step of the process," Plaintiffs fail to establish that voters of a protected class in Jefferson and Fayette

Counties face such burdens disproportionately or that such disparities result from the Counties' actions.

### i. Transportation Method to a Single Polling Location

Plaintiffs argue Black voters are disproportionately burdened by a single polling location because "[b]lack voters face a greater risk of contracting the virus on the way to the polls." DN 1 ¶ 57. Plaintiffs cite several articles for the propositions that Black Americans are generally less likely to own cars, more likely to face driver's license suspensions, and more dependent on public transportation. DN 1 at 18. But, Plaintiffs provide no support for the relevant question of whether this is true of Black voters in Jefferson and Fayette counties. *Id.* Armed with only general facts about public transportation use among Black across the country, Plaintiffs cannot demonstrate how the use of single polling locations will result in an adverse and disparate impact on protected class members' opportunity to vote in the relevant counties.

### ii. Lines at a Single Polling Location

Plaintiffs argue Black voters are "disproportionately burdened by long lines at the polls," citing a study that concluded "residents of entirely-Black neighborhoods waited 29% longer to vote and were 74% more likely to spend more than 30 minutes at their polling place than residents of all-white neighborhoods" during the 2016 Election. DN 4-1 at 10 (citing Keith Chen et al., *Racial Disparities in Voting Wait Times: Evidence from Smartphone Data* (Nov. 14, 2019), https://www.kareemhaggag.com/f/Racial_Disparities_in_Voting_Wait_Times.pdf).   Plaintiffs' argument is without merit. Even if residents of entirely Black neighborhoods have historically had longer wait times than residents of all white neighborhoods, the voting schemes in Jefferson and Fayette counties remedy any disparity in burdens faced by voters of different ethnic groups by requiring voters from every neighborhood in the county to wait in the same line. At bottom,

Plaintiffs' argument about line length has no relevance because Black voters who choose to vote in person will receive an identical opportunity as all other members of the electorate "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

### iii. Disparity in Health Outcomes

Plaintiffs argue that "if Black voters contract the virus while voting in-person, they are more likely to suffer serious and even deadly consequences, because they disproportionately suffer from the underlying medical conditions that exacerbate the virus." DN 4-1 at 11. In a similar vein, Plaintiffs argue that "if Black voters contract the virus while voting in-person, they are also more likely to suffer serious consequences because of inequalities in our health care system," *id.* at 13, and that they "face increased risks of spreading the virus to their loved ones and community." *Id.* at 14.

Plaintiffs' arguments have no direct bearing on the Court's Section 2 analysis because Jefferson and Fayette Counties' plans to use single voting locations for in-person voting on Election Day do not cause the health disparities. While these health disparities are tragic, the question before the Court is not whether COVID-19 may cause disproportionately severe health outcomes to infected members of a protected class but whether the provision of a single, in-person, Election Day polling location results in an adverse disparate impact on protected class members' opportunity to vote. It does not. Because Plaintiffs fail to demonstrate how the use of a single polling place will result in an adverse disparate impact on protected class members' opportunity to participate in the political process, the Voting Rights Act provides no remedy.

Furthermore, even if Plaintiffs had demonstrated that the provision of a single, in-person, Election Day polling location caused a discriminatory impact, their arguments would fail the second part of Section 2's two-step analysis because, given the totality of the circumstances,

Plaintiffs have not shown that "the challenged voting practice causes the discriminatory impact as it interacts with social and historical conditions." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 638 (6th Cir. 2016).

Jefferson and Fayette Counties' plans to provide a single polling location for Election Day does not exist in a vacuum, and the Court will not evaluate it as such. *See Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 353 (6th Cir. 2018)("[P]rovided that the initial step is satisfied, we consider the totality of the circumstances."). State and local officials have taken significant steps to reduce health risks to poll workers and voters while simultaneously increasing all voters' opportunity to participate in the 2020 Primary. The threat of a global pandemic, along with the election officials' response, must be part of the "totality of the circumstances" considered by this Court under the second part of its Section 2 analysis. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 242 (4th Cir. 2014)("By looking at each provision separately and failing to consider the totality of the circumstances, then, the district court misapprehended and misapplied the pertinent law.").

Officials and agencies throughout the Commonwealth have taken the following steps to ensure that every Kentucky voter has an equal opportunity to participate in the 2020 primary election:

- Governor Beshear declared "All Kentuckians should utilize absentee voting by mail for the June 23, 2020 primary election if they are able to do so." Exec. Order 2020-296 (Apr. 24, 2020) at ¶ 1.

- Governor Beshear ordered the Board of Elections to "promulgate emergency regulations to provide [] expanded absentee voting by mail" and "take all reasonable steps to ensure the safety of county clerks and poll workers when direct voting (not by mail) is necessary." *Id*. at ¶ 2–3.

- Governor Beshear ordered that the State Board of Elections ("SBE") take the following steps to ensure the safety of county clerks and poll workers during in-person voting: (1) permitting in-person absentee voting to begin June 8, 2020, (2) directing clerks to prioritize such voters by appointment, (3) providing

personal protective equipment (PPE) and materials to assist in proper sanitization to clerks and poll workers, and (4) instructing county clerks to implement procedures that limit direct contact between individuals, whether poll workers or voters. Id. at ¶ 3 a–d.

- The SBE adopted a regulation allowing all voters to request absentee ballots to vote by mail without excuse or notarization. 31 KY. ADMIN. REGS. 4:190E (2020) at 1.

- The SBE sent a non-forwarding postcard to every registered voter of the Commonwealth to inform them of the changes being made to the June 23, 2020 election as a result of the COVID-19 pandemic, as well as the steps required to request an absentee ballot through the SBE secure online portal or by calling their County Clerk. *Id*. at Section 4.

- The SBE paid for return postage for all absentee ballots. *Id*. at Section 6.

- County Clerks made their offices and telephone lines available for the purpose of allowing registered voters of their respective counites to schedule appointments to vote absentee by appointment beginning from June 8, 2020 until June 22, 2020 for no fewer than 5 days per week in the two weeks before the week of election day. *Id*. at Section 10.

- County Clerks made secure drop boxes available from June 5 to June 23 so that voters could cast absentee ballots in person. 31 KAR 4:190E §7.

- Jefferson County officials allowed registered voters to cast in-person absentee ballots at the Edison Center, located at 701 W. Ormsby Avenue, Louisville, KY 40203, prior to Election Day between June 8 and June 22. DN 38-2 at ¶17.

- Fayette County officials allowed registered voters to cast in-person absentee ballots by appointment at the Lexington Senior Center, located at 195 Life Lane, 40502, prior to Election Day between June 8 and June 22. DN 38-7 at ¶ 11.

- The Transit Authority of River City offered free rides on public busses on Election Day, running every 30 minutes from 6 a.m. to 6:30 p.m. from Union Station (1000 W. Broadway) to the central polling location at the Kentucky Exposition Center (937 Phillips Lane). DN 38-2 at 8.

- LexTran offered free rides on its public busses on Election Day. DN 38 at ¶ 14.

Given the totality of the circumstances, Plaintiffs present no relevant statistical evidence that a single polling location for in-person voting on Election Day will necessarily result in a cognizable, racially disparate impact such that Blacks will be afforded "less opportunity than other

members of the electorate to participate in the political process." 52 U.S.C. S 10301(b). Plaintiffs' unsubstantiated criticism of the proposed practice is insufficient to meet their burden of establishing that the provision of a single polling place, in the context of a broad array of other available voting methods in the context of a global pandemic, will result in a racially disparate impact actionable as a violation of Section 2. *See Gingles*, 478 U.S. at 45 (stating that courts must undertake "a searching practical evaluation of the past and present reality" along with a "functional view of the political process") (internal quotation marks and citations omitted). Accordingly, the Court finds no Voting Rights Act violation.

**B.  Additional Injunctive Relief Factors – Irreparable Harm to Movant, Harm to Others, Public Interest**

While no one factor is determinative, we need not address the additional three factors in determining whether injunctive relief should issue. The conclusion that  Plaintiffs have no likelihood of success on the merits precludes issuance of a TRO or preliminary injunction in this case. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 362 (6th Cir. 2008) *citing Bonnell v. Lorenzo*, 241 F.3d 800,899 (6th Cir.), *cert. denied*, 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001).

**IV. <u>Conclusion</u>**

For the reasons stated above, the Court will deny Plaintiffs' motion for injunctive relief (DN 4). A separate order will be entered this date in accordance with this opinion.

June 18, 2020



**Charles R. Simpson III, Senior Judge**
**United States District Court**